## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KINBOOK, LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| | : Civil No. 2:10-cv-04828 (GP) |
| | : |
| v. | : |
| | : |
| MICROSOFT CORPORATION, | : |
| | : |
| Defendant. | : |
| | : |
| | : |

## PLAINTIFF KINBOOK, LLC'S BRIEF IN OPPOSITION TO DEFENDANT MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT

**LAULETTA BIRNBAUM, LLC**
**RICHARD D. GALLUCCI, JR., ESQ.**
**STEVEN H. DOTO, ESQ.**
WASHINGTON PROFESSIONAL CAMPUS
860 ROUTE 168, SUITE 204
TURNERSVILLE, NEW JERSEY 08012
TELEPHONE: 856-232-1600
*ATTORNEYS FOR PLAINTIFF*
*KINBOOK, LLC*

**TABLE OF CONTENTS**

I.      INTRODUCTION..................................................................................................1

II.     PROCEDURAL HISTORY......................................................................................2

III.    STATEMENT OF FACTS......................................................................................6

    A      Origins of Kinbox, Development of Application, Trademark Registration, and
        Marketing......................................................................................................6

    B.     The Evolution of the XBOX Platform from a Gaming console to a Family Entertainment
        Center.........................................................................................................12

    C.     The New Xbox Platform: Functionality, Target Audience and Sources of
        Revenue......................................................................................................16

        1.      Functionality............................................................................16

        2.      Target Audience (Consumer Base).....................................................17

        3.      Sources of Revenue....................................................................18

    D.     Perceived Meaning and Marketing Strategy Behind the Name "Kinect for Xbox"........18

    E.     Kinbook's Fears of Confusion Are Realized in the Marketplace...........................25

IV.     ARGUMENT......................................................................................................27

    A.     Summary Judgment Standard........................................................................27

    B.     Genuine Issues of Material Fact Exist as to whether Microsoft is Liable for Reverse
        Trademark Infringement Precluding Summary Judgment....................................28

        1.      Plaintiff Kinbook Has A Valid and Protectable Mark...............................30

        2.      Microsoft's Use of "Kinect for Xbox" is Likely to Cause Confusion with
                Plaintiff's "Kinbox" Mark..........................................................33

V.      CONCLUSION.................................................................................................56

*A & H Sportswaer, inc. v. Victoria's secret Stores, Inc.*, 237 F.3d 198  (3d Cir. 2000)......30, 33, 34, 35, 44, 52

*A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3d Cir. 1986)…….……………………….……..…..31

*Altira Group, LLC v. Phillip Morris Companies, Inc.*, 207 F.Supp.2d 1193 (D.Colo. 2002)....................43

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2502 (1986)……………...……………..27

*Brookfield Communications, Inc. v. West Coast Entertainment Corporation*, 174 F.3d 1036 (9th Cir. 1999)………………………………………………………………………………45

*Checkpoint Systems, Inc. v. Checkpoint software Technologies, Inc.*, 269 F.3d 270  (3d Cir. 2001)................................................................ 30, 35, 36 ,41, 42, 44, 45, 46, 50, 51, 55

*Commerce National, Ins. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432 (3d Cir. 2005)…....…….29

*Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056 (3d Cir. 1991)…………………………………………………………………………...27

*Daddy's Junky Music Stores v. Big Daddy's Family Music Center*, 109 F.3d 275 (6th Cir. 1997)……….45

*Doeblers' Pa. Hybrids, Inc. Doebler*, 442 F.3d 812 (3d Cir. 2006)……………………………………28

*Dranoff-Perlstein Assoc. v. Sklar*, 967 F.2d 852 (3d Cir. 1992)……………………………………...31

*Evans Products Co. v. West American Ins. Co.*, 736 F.2d 920 (3d Cir. 1984)……………………………30

*Express Servs., Inc. v. Career Express Staffing Servs.*, 176 F.3d 183 (3d Cir. 1999)……………...31, 33

*Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008)……………………………………………28

*First Franklin Financial Corp. v. Franklin First Financial, Ltd.*, 356 F.Supp. 2d 1048 (N.D. Cal. 2005)………………………………………………………………………………47

*Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466 (3d Cir. 1994)....29, 31, 32, 35, 39, 43, 44

*Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277 (3d Cir. 1991)….................................33, 41

*Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F.3d 463 (3d Cir. 2005)………………29, 33, 34, 39

*Gray v. Meijer Inc.*, 295 F.3d 641 (6th Cir. 2002)……………………………………………………40

*Huggins v. Coatsville Area school District*, Nos 07-4917, 09-1309, slip on. 2010 WL 4273317 (E.D. Pa. Oct 29, 2011)………………………………………………………………………27

*Hugh v. Butler County Family YMCA*, 418 F.3d 265 (3d Cir. 2005)………………………………27

*Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356, n.5 (9th Cir, 1985)…..…………………28

*Miller v. Ind. Hosp.*, 843 F.2d 139 (3d Cir. 1988)…...…………………………………………27

*Sabina Corporation v. Creative Compounds, LLC*, 609 F.3d 175 (3d Cir. 2010)...............................32

*Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669 (Fed. Cir. 1984)...........................41

*Tanel Corp. v. Reebok International, Ltd.*, 774 F.Supp. 49 (D. Mass. 1990)...........................29

*Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609 (7th Cir. 1965)..........................................45

*Versa Products Co., Inc. v. Bifold Co. Mfg. Ltd.,* 50 F.3d 189 (3d 1995).................................44, 46

*Walden v. Saint Gobbain Corp.*, 323 F.Supp. 637 (E.D. Pa. 2004)..........................................27

*Wynn Oil Co. v. Thomas*, 839 F.2d 1183(6th Cir. 1988)..............................................31

## I.      INTRODUCTION

Microsoft's motion for summary judgment, filed well before the close of discovery in this case, is simply the latest step in a calculated strategy by Microsoft to distort the facts pertaining to Kinbook's trademark infringement claim in a self-serving attempt to define its own version of Plaintiff's claim.

First, Microsoft conveniently ignores the fact that Microsoft's mark "Kinect for Xbox" contains both words "Kin" and "box," similar to Plaintiff's mark, "Kinbox." Microsoft focuses entirely on the "Kin" portion of the parties' marks and turns a blind eye to the voluminous evidence that is unfavorable to Microsoft in the analysis of Plaintiff's claim under the relevant case law, thereby skewing such analysis and enabling it to argue for summary judgment.

Second, in an attempt to obfuscate, Microsoft misrepresents the functionality as well as the target user-base of its own products.  In reality, the Kinect for Xbox is part of a platform-based offering marketed by Microsoft as the "Xbox 360 entertainment platform" (hereinafter, the "Xbox Platform") that includes the Xbox, Kinect for Xbox, the Xbox Live website, and other content and online services.  With the release of the Kinect for Xbox, Microsoft also expanded the functionality of the Xbox platform in order to appeal to a larger audience.  The core functionality that Microsoft has integrated into its Xbox Platform is clearly centered around the explosion of online social networking since the advent of websites such as Facebook, Twitter, You Tube and Skype.  Closer examination of the functions of the underlying products at issue and their marks reveals significant similarity in appearance, meaning, functionality and target consumer-base.

1

For these reasons, and as discussed more fully below, Microsoft's theory of this case is misplaced and its analysis misapplied. Instead, as demonstrated in great detail herein, Plaintiff's trademark infringement claim based on reverse confusion is viable and there exists numerous genuine issues of material fact, both on the ultimate issue of likelihood of confusion and otherwise, thereby precluding the entry of summary judgment.

## II.   PROCEDURAL HISTORY

On September 17, 2010, Plaintiff Kinbook, LLC ("Kinbook" or "Plaintiff") initiated this suit by way of complaint against Defendant Microsoft Corporation ("Microsoft" or "Defendant") for unfair competition and reverse trademark infringement pursuant to the Lanham Act, 15 U.S.C.A. §1125(a), in connection with two Microsoft products, namely the "KIN" mobile smart phone and the "Kinect for Xbox." On September 23, 2010, Microsoft waived service of the summons under Fed. R. Civ. P. 4, and subsequently answered the complaint.

On January 4, 2011, the Court held the initial pre-trial conference and, following the conference, entered a Scheduling Order setting the discovery end date in this matter as July 1, 2011. A true and correct copy of the original scheduling order is attached as Exhibit A to the accompanying Declaration of Richard D. Gallucci, Jr. ("Gallucci Decl.") in support of Plaintiff Kinbook's opposition to Defendant Microsoft's motion for summary judgment.

Discovery ensued and on April 12, 2011, without having produced a single document to Kinbook, Microsoft took the 30(b)(6) deposition of Cassandra Toroian, Kinbook's 30(b)(6) witness. *See* Gallucci Decl., Exhibit B attached thereto. On June 21, 2011, Plaintiff filed a motion to extend discovery in this action. Gallucci Decl., Exhibit C, Docket Entry Nos. 24 and 25. On June 24, 2011, the parties filed a joint motion to extend

discovery for a total of 67 days and setting the factual discovery end date for September 8, 2011 with a commensurate extension of all other dates in the original scheduling order.  Id. Exhibit C, Docket Entry No. 26.  On June 28, 2011, the Court issued an amended scheduling order setting the factual discovery end date for September 8, 2011 pursuant to the parties' joint motion to extend discovery.  Gallucci Decl., Exhibit D.

On July 8, 2011, Microsoft filed its now pending motion for summary judgment. Gallucci Decl., Exhibit C, Docket Entry Nos. 28 and 29.

As a result of the extension of discovery, the parties met and conferred as to the availability of Microsoft's 30(b)(6) witnesses that, by agreement among counsel, would be deposed in Seattle, Washington.  Thereafter, on August 4, 2011, counsel for Kinbook issued a revised notice of deposition of Microsoft's 30(b)(6) witnesses that would take place on August 18 and 19, 2011.  Gallucci Decl., Exhibit E.  Among the topics that Microsoft's corporate designees were to provide testimony included "Microsoft's selection and use of the terms "Kinect," "Kin" and/or "Kinect for Xbox 360", including any communications between Microsoft and/or anyone on acting on its behalf and any third party."  Gallucci Decl., Exhibit E, Subject Area No. 1.  In addition, Kinbook sought witnesses that could testify as to the profits and losses, advertising and promotion expenses, and revenue associated with the subject products.  Gallucci Decl., Exhibit E, Subject Area Nos. 19, 20 and 21.  All of the above topic areas corresponded to specific document requests propounded upon Microsoft.

On August 5, 2011, the parties filed a stipulation setting forth a briefing schedule as to the motion for summary judgment in light of the agreed upon 30(b)(6) witness deposition dates.  Gallucci Decl., Exhibit C, Docket Entry No. 30. On August 12, 2011, counsel for

Kinbook wrote to counsel for Microsoft outlining specific deficiencies in Microsoft's production of documents related to profits and losses, advertising and promotion expenses, and revenue associated with the subject products.  Gallucci Decl., Exhibit F.

On August 18, 2011, counsel for Kinbook deposed Kolby Blackham, Microsoft's proffered 30(b)(6) witness for the topic areas as they related to Microsoft's Kin phone product.  Gallucci, Decl., Exhibit G.  During the deposition, despite specific document requests seeking the production of communications related to the naming, branding, advertising and marketing of the Kin product, Kinbook discovered that Microsoft did not look for or produce any emails with respect to these issues despite the existence of such email communications.  Gallucci Decl., Exhibit G, Deposition of Kolby Blackham ("Blackham Dep.")  at 40-13 to 44-18.

Thereafter, on August 19, 2011, counsel for Kinbook took the deposition of Eli Friedman,  Microsoft's proffered 30(b)(6) witness for the topic areas as they related to Microsoft's Kinect for Xbox 360 Platform.   Gallucci Decl., Exhibit H.  During the deposition, Mr. Friedman testified on behalf of Microsoft that he communicated with third-parties in determining or selecting the name for the Kinect for Xbox via e-mail, that those emails do exist, and that he provided them to a Microsoft paralegal.  Gallucci Decl., Exhibit H, Deposition of Eli Friedman ("Friedman Dep.") at 41-14 to 43-22.  Notably, neither such email communications, nor any reports attached thereto, were produced to Kinbook.  In addition, Mr. Friedman was unable and unprepared to answer any questions related to the revenues, profits and losses, advertising and promotion expenses, and net income associated with the Kinect for Xbox.  Friedman Dep. at 121-11 to 136-9.

On August 25, 2011, counsel for Kinbook wrote to counsel for Microsoft highlighting the deficiencies in Microsoft's document production related to the naming and branding of the products as supported by the 30(b)(6) witness testimony, and seeking a further extension of discovery so that Kinbook could depose a witness that had actual knowledge and was prepared to answer questions related to the revenues, profits and losses, advertising and promotion expenses, and net income associated with the Kinect for Xbox. Gallucci Decl., Exhibit I.

Following a meet and confer conference among counsel, counsel for the parties agreed to submit a joint motion to stay discovery pending disposition of Microsoft's motion for summary judgment and, in the event the Court denied summary judgment as to liability, affording Kinbook an additional 45 days of factual discovery in the action.  Gallucci Decl., Exhibit C, Docket Entry No. 32.  Kinbook now submits its opposition to Microsoft's motion for summary judgment.

## III.   STATEMENT OF FACTS

### A. Origins of Kinbox, Development of Application, Trademark Registration, and Marketing

Plaintiff Kinbook is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 151 Blackpool Road, Rehoboth Beach, Delaware 19971.  *See* accompanying Declaration of M. Cassandra Toroian in support of plaintiff Kinbook's opposition to Defendant Microsoft's motion for summary judgment ("Toroian Decl."), Exhibit A.  Plaintiff Kinbook is a small, female-owned company formed by M. Cassandra Toroian and Jacqueline Blue who serve as co-managing members of the company.  Gallucci Decl., Exhibit B, Deposition of M. Cassandra Toroian ("Toroian Dep.") at 8-2 to 19.

Kinbook is the developer of on-line social networking software and applications designed for the sharing of information between and among friends and family members. In May 2009, Kinbook engaged in the process of developing a specific on-line social networking software application designed for the sharing of information such as online messages, photos and videos between and among friends and family members.  Toroian Dep. at 47-21 to 49-22.

Originally, as of June 23, 2009, Kinbook sought to develop its own website that would be called "Kinbook.com" with a software engineering company known as Blueliner, LLC.  Toroian Decl., Exhibit B.  Blueliner provided Kinbook with a website development proposal for the purpose of developing "a first-class, highly interactive social networking website." Id. at 3.  Blueliner provided Kinbook with a "Kinbook Web Development Worksheet" outlining the costs of development at $124,542 for Phase 1 and $130,092 for

Phase 2.  Toroian Decl., Exhibit C.  As amply set forth in the original Web Development

Worksheet, the initial concept behind the application developed by Kinbook was to provide

friends and family a secure environment within which to share messages, photos, videos,

and integrated calendars.  Id.  At future phases the product would be accessible through a

mobile phone device.  Id. at 4.  In addition, it was anticipated that revenue would be

generated through paid subscriptions and the sale of content.  Id.

On July 9, 2009, Kinbook decided that, in order to contain costs associated with

developing its planned software application and to attract a user base, it would initially

launch the application through an existing site, namely, Facebook®.  Toroian Decl., Exhibit

D; Toroian Dep. at 235-19 to 237-18. Facebook is a social networking website launched in

February 2004 that is operated and privately owned by Facebook, Inc. and had more than

500 million active users as of July 2010. Users can add people as friends and send them

messages, and update their personal profiles to notify friends about themselves.

Additionally, users can join networks organized by workplace, school, or college.  Gallucci

Decl., Exhibit J.

In light of its decision to launch its application within Facebook, Kinbook engaged

the services of the law firm of Ratner Prestia to assist Kinbook with the trademark

application process.  Toroian Decl., Exhibit E.  On September 3, 2011, Rex Donnelly,

Esquire of the Ratner Prestia firm advised Kinbook that upon review of the TTAB records

of the U.S. Patent and Trademark Office, Facebook had opposed or threatened to oppose

every applicant for a "_____BOOK" formative mark over the past several years.  Toroian

Decl., Exhibit E.   Nevertheless, trademark counsel for Kinbook contacted Facebook, who in

fact objected to the use of the name "Kinbook" on its website and therefore, the original

7

mark "Kinbook" would not be available for use on Facebook. Id.; *see also* Toroian Dep.

60-22 to 61-10; 61-21 to 62-7; 234-1 to 20; *see also* Toroian Decl. Exhibit F.  Toroian

suggested instead using the names "Kinbox" and "Munchkinbox."  Toroian Decl., Exhibit

E.  Kinbook spent about 200 hours developing the trademark and trade names Kinbox and

Munchkinbox.  Toroian Dep. at 78-8 to 81-7.  Other names were also considered, such as

Memory Box.  Toroian Dep. at 82-25 to 83-4.  The term "Kinbox" was finally chosen in

order to connote a product that was geared to providing a place where friends and family

could meet and interact.  *See* Toroian Decl., Exhibit G.  Indeed the mission of Kinbox was

to "provide a digital world for family memories and communications, for current and future

generations so they won't forget."  Toroian Decl., Exhibit G at 2.

     Kinbook spent about $35,000 for a software engineering company called Blueliner,

LLC to develop what is now known as the Kinbox®, and its companion subset

Munchkinbox®, software applications.  Toroian Dep. at 77-13 to 78-21.  Indeed, on

September 10, 2009, Kinbook entered into a "Kinbox Facebook Application Contract" for

the purpose of building a "multi-functional Facebook application called Kinbox, that allows

friends and family members to interact with one another, share pictures, create profiles of

members who have passed away, share family recipes, and over time, much more."  Toroian

Decl., Exhibit H at 1.  A Kinbox member is afforded the ability to upload pictures, videos

and other content either from such users Facebook account or directly upload content to the

Kinbox without the obligation of sharing such information with the overall Facebook

profile.  *Id.* at 2; *see also* Toroian Dep. at 100-4 to 7; Toroian Decl., Exhibit G at 8.

     Kinbox was unique at the time it was developed because it allowed people that were

members of Facebook to form their own social network and not "let everyone that they are

friends with on Facebook in." By way of example, you can set up a Kinbox that your

mother was a part of but your mother did not have to be one of your friends on Facebook.

"So it was like a little world within Facebook." Toroian Dep. at 45-3 to 16. In addition, one

of the unique features of Kinbox is that the data, such as the storage of photos and videos,

does not reside on storage provided by Facebook. Rather, Kinbook pays for its own offsite

storage of the data so that the application and its content could be moved off Facebook at

some point and onto an independent website developed for Kinbox. Toroian Dep. at 55-22

to 56-6.

      To access the Kinbox application, end-users or consumers use their personal

computers (PCs) fitted with a mouse and keyboard to access the internet. Once on the

internet, the end-user goes to the website for Facebook and then, once there, can access their

Kinbox to send messages to friends and family, as well as to upload pictures and video that

can be viewed by friends and family members that are members of the end-user's Kinbox.

*See* Toroian Decl., Exhibit I; Gallucci Decl., Exhibit K.

      The end goal or dream according to co-managing member Toroian was to see

Kinbox become just a large as Facebook in the realm of social networking as it pertains to

friends and families, a term that can be many things to many people. Toroian Dep. at 32-2 to

6. In furtherance of this goal, Kinbook began preparing a "pitch book" for potential

investors based on its original PowerPoint presentation. Toroian Dep. at 88-8 to 89-25;

Toroian Decl., Exhibit G.

      It was always Kinbook's intention to turn Kinbox into an independent, stand-alone

website. To that end, Kinbook purchased website addresses or URLs. Toroian Dep. at 24-6

to 25-5. Specifically, Kinbook purchased Kinboxx.com and Kinbox.org. Toroian Decl.,

Exhibit I. Notably, Kinbox.com was already taken. Id. Kinbook's owners also have future plans to develop a mobile phone application for its Kinbox product. Toroian Dep. 86-6 to 87-3; Toroian Decl., Exhibit G at 23.

Contrary to Microsoft's contention that Kinbox had only 14 active users as of May 2011 (*see* Microsoft Memorandum of Law at 7, ¶18), Facebook reported that Kinbox had 16,685 monthly active users. Toroian Decl., Exhibit J. The age segments design for the Kinbox Platform include what Kinbook deems "Munchkins (age 0-10), Junior (age 11-17), Young Adult (age 18-30), Adult (31-64), and Senior (65+)." Toroian Decl., Exhibit G at 13; Toroian Dep. at 247-5 to 13. The Kinbox application does not currently charge a fee but rather its initial model is to generate revenue from "ad revenue and eventually from selling photos, other products with photos on them (i.e. calendars, photo books etc.)," otherwise known as content. Toroian Decl., Exhibit E.; *see also* Toroian Decl., Exhibit G at 27. Another source of revenue will be the sale of additional storage for photos and video. Toroian Dep. at 207-9 to 208-5. Kinbook does not generate revenues to date because it has not been able to fully implement its plans with respect to its product. Toroian Dep. at 44-18 to 21. As of September 4, 2011, Facebook reports that Kinbox has 16,752 monthly active users. Gallucci Decl., Exhibit L.

Kinbook spent a significant amount of time building its product and went through the legal channels to protect the name so that the time building the company, product and service would be protected. Toroian Dep. at 31-11 to 32-1. On or about September 14, 2009, well before Microsoft had applied for trademark protection for the "Kin" phone or "Kinect for Xbox" products, Kinbook engaged the Ratner Prestia law firm to conduct a trademark search for the marks Kinbox and Munchkinbox. Toroian Decl., Exhibit K. On

10

September 22, 2009, Kinbook received the results of the search that confirms that Microsoft had not made any trademark applications with respect to either the "Kin" phone or the "Kinect" for Xbox. Toroian Decl. Exhibit L. While there were marks that showed up containing the word "Kin", many of them were abandoned. Toroian Dep. at 103-16 to 104-1.

On December 2, 2009, Kinbook filed its initial application with the United States Patent and Trademark Office for the registration of the trademarks and trade names Kinbox and Munchkinbox. Toroian Decl., Exhibit M.

Also in December 2009, Kinbook's software application for family members under the trade names Kinbox and Munchkinbox became available for actual use by Facebook® users. Toroian Decl., Exhibit N; Toroian Dep. at 214-4 to 11; 226-17 to 21.

On or about September 3, 2010, the United States Patent and Trademark Office accepted the Statements of Use filed in connection with Kinbox®, Munchkinbox®, Kinbox® and its design, and Munchkinbox® and its design under application Nos. 77/884017, 77/884060, 77/884174, and 77/884195 respectively.   To date, Kinbook continues to operate, develop and support its product as a social networking application for use on Facebook. Toroian Decl., Exhibit M.

Originally, Kinbook intended to spend a minimum of $250,000 marketing the Kinbox application prior to Microsoft's actions. Toroian Dep. at 112-10 to 19. Kinbook has had to alter its timeline as to rolling out Kinbox in any larger fashion because Microsoft had already spent significant sums of money in its marketing campaign. Toroian Dep. at 45-20 to 46-5.

According to Toroian, despite Kinbook's first-in-time registration of its marks
Kinbox and Munchinkinbox, "a company the size of Microsoft could afford to spend
hundreds of millions of dollars in a marketing campaign so that it would envelop anything
that I was trying to do." Toroian Dep at 94-13 to 21. This, in turn, diminished any goodwill
that Kinbox was beginning to obtain in the marketplace. *Id.* at 94-22 to 95-5.
Nevertheless, Kinbook did spend a few thousand dollars on advertising by way of banner
ads. *Id.* at 246-1 to 23.

**B.      The Evolution of the XBOX Platform from a Gaming Console to a
         Family Entertainment Center**

Contrary to Microsoft's repeated, self-serving assertions in its Memorandum of Law,
the Kinect for Xbox is marketed by Microsoft as a family entertainment center rather than
merely as a gaming console. As Microsoft itself announced, "A decade ago, Microsoft
launched the Xbox which transported people into a new world of social games and
entertainment. Shortly thereafter, Microsoft introduced people to the cloud, launching Xbox
LIVE and connecting millions through the games and entertainment they love. In 2010,
Microsoft launched a new world of controller-free experiences with Kinect for Xbox 360,
allowing everyone to experience how Xbox transforms fun and entertainment in the living
room." Gallucci Decl., Exhibit M, Microsoft Press Release "2010: The Biggest Year in
Xbox History," published January 11, 2011. Pursuant to an internal document prepared by
or on behalf of Microsoft titled "Evolving the Xbox Brand," Microsoft and/or its third party
branding consultant identified the following two important stages in the evolution of the
Xbox brand:

(i)      the first column was titled **"HOW THEY SEE US (UNAIDED)"** and

indicated that the then current market viewed the brand as a "fast-paced / intense gaming"

platform and identified the primary user-base as "teen & adult males;" and

(ii)      the third column, titled **"WHERE WE WANT TO BE (NXE + NATAL[1])"**

identified the direction that Microsoft desired to move the Xbox brand with the addition of

the Kinect sensor.  Under this column, Microsoft identified the following bullet points

identifying why its significant new functionality would help it evolve the Xbox brand from

simply a gaming system for teen and adult males into a family entertainment center

accessible to males and females of all ages:

- Everything you want in one console
- On-demand entertainment
- Accessible to everyone
- Connect to friends and family when together or far apart
- More active / physical
- Futuristic / innovative

Gallucci Decl., Exhibit O.

Moreover, in Microsoft's internal E&D Client Input Document referencing the

"Kinect Digital Campaign (Platform)," Microsoft expresses how the Kinect for Xbox will

have an industry-changing effect:

> Xbox is set to disrupt the video games industry and transform
> the entertainment landscape by launching Kinect, a
> revolutionary new way to experience entertainment.  The end-
> goal is to expand the relevancy of the Xbox brand among new

---

[1] Prior to its release, Microsoft utilized code names to identify its new product offerings.  "Project Natal" was the code name for the launch of its new and improved Xbox platform that included (i) under the code name "Agra," the Kinect sensor, (ii) under the code name "Trinity," a redesigned Xbox console that was smaller, quieter, and wireless, and (iii) under the code name "Berlin," a new user interface for the console and Xbox Live.  Gallucci Decl., Exhibit N.

audiences, grow Xbox business and increase the industry as a whole.

Gallucci Decl., Exhibit P.

On November 4, 2010, Microsoft released the Kinect for Xbox to the public as a bundled package and also began offering the Kinect sensor as a stand-alone product for customers that already owned an Xbox console. The addition of the Kinect sensor to the Xbox console was viewed as so revolutionary and important to Microsoft that it deemed it a "re-launch" of the Xbox platform. Below is a relevant excerpt from an interview of Shane Kim, Microsoft's corporate Vice President of Strategy and Business Development, by Kris Graft and Brandon Sheffield of www.gamasutra.com:

> Shane Kim, Microsoft's corporate VP of strategy and business development for its interactive entertainment business, spoke with Gamasutra at the show on how he sees Project Natal as a relaunch for the Xbox 360 console -- and the challenges of attracting new consumers to the fold is not lost on him. After all, the company called its New Xbox Experience, which drastically changed the system's interface, a relaunch too.
>
> . . .
>
> **KG: How does the marketing shift? It seems like it's going to aggressively evolve once Natal changes the situation. You and I have talked about going after casuals before -- but this goes way beyond just launching *Banjo-Kazooie*.**
>
> SK: Oh yeah. It's going to be the launch of Xbox 360.
>
> **KG: It's going to be like a relaunch?**
>
> SK: Absolutely. It will be that big. Now, the good news is that it's not a new hardware architecture; we're not forcing customers to have to go buy a new console because it will work with every existing Xbox 360 out there. But in terms of its importance and scale of what we're talking about, yeah, absolutely, it will be like the launch of a new Xbox.

. . .

Gallucci Decl., Exhibit Q.

The market's response to Microsoft's re-launch of Xbox with Kinect for Xbox was better than they expected. Pursuant to Microsoft's Press Release "2010: The Biggest Year in Xbox History" published January 11, 2011, Microsoft stated that "[w]e predicted that we would sell 5 million Kinect sensors by the end of holiday. So how did we do? Well, we beat our forecast. In the first 60 days, we've sold 8 million Kinect sensors worldwide." Gallucci Decl., Exhibit M.

Microsoft's CEO, Steve Ballmer, confirmed the importance of the Kinect for Xbox in an interview of him conducted by USA Today published on January 20, 2011 and titled "One on One: Ballmer Says Xbox, Kinect are Key Products." Mr. Ballmer also reiterated Microsoft's view that the product is a family entertainment center, not a gaming console. Key excerpts from that interview are below:

**Q. What's most important right now for Microsoft (MSFT) in terms of your new product launches?**

A. If you want to know where is the consumer heat, the things that people want to get their hands on. It's Xbox and Xbox Kinect. I think about my own family. My wife used to say, "No, no, that's the machine the boys use," and now she says, "Yeah, I want to go watch movies. Let's go play the dance game." It opens up accessibility to family entertainment because with the Kinect, you control these systems with your body, with your voice. We've opened up the world of content in TV, movies. You just sit there and say "Xbox" or "play movie."

**Q. You sold 8 million Kinects over the holidays, more than you expected. What differentiates it from other gaming consoles on the market?**

15

A. Xbox isn't a gaming console. Xbox is a family entertainment center. It's a place to socialize. It's a place to watch TV. We have Hulu coming. It's the only system where you are the controller. Your voice, your gestures, your body.

Gallucci Decl., Exhibit R.

It is clear, despite what Microsoft may claim for self-serving purposes in its defense of this lawsuit, that the Kinect for Xbox amounted to the launch of a new, revolutionary product offering and that the bundled product was meant to replace the limited-purpose Xbox of prior years and to expand the potential target audience of the platform.

**C.    The New Xbox Platform:  Functionality, Target Audience and Sources of Revenue.**

**1.    Functionality.**

Mr. Friedman, Microsoft's corporate designee with respect to the Kinect for Xbox product, testified that the products that Microsoft markets under the Xbox platform brand are the Xbox console, Kinect for Xbox, Xbox Live and Kinect Share, as well as a number of games.  Gallucci Decl., Exhibit H, Friedman Dep., at 17-21.

Through the Xbox platform, users can perform the following functions: (a) communication through instant messaging (Friedman Dep. at 20) and video chat through Video Kinect[2] (Friedman Dep. at 38), (b) sharing of content and playing games with other Xbox Live subscribers (Friedman Dep. at 20), (c) participation in online social networking through sites such as Facebook, Twitter and Video Kinect (Friedman Dep. at 36-10 to 37-

---

[2] Per testimony of Friedman, the video chat functionality available with the Kinect for Xbox is similar to the chat functionality available to someone having a camera on a personal computer and using a Web-based service such as Skype to video chat.  Friedman Dep. at 39.

15), and (d) uploading and sharing photographs and videos with select[3] friends and family (Friedman Dep., at page 22-18 to 23-6). Likewise, a user of the Kin Phone product can access the Internet, connect to Facebook, and upload photographs and write messages to friends. Blackham Dep. at 78-20 to 79-23.

The Kinect for Xbox cannot be used without an Xbox console and the content, games and other functionality available in Xbox Live can only be accessed through the Xbox platform and not through personal computers or other Web-enabled devices. Friedman Dep. at 24, 71; *see also* Microsoft's Memorandum of Law at 5. Mr. Blackham, Microsoft's other corporate designee, testified that the Kinect for Xbox is never going to be marketed without the Xbox. Blackham Dep. at 29-15 to 22.

### 2.      Target Audience (Consumer Base).

Mr. Friedman testified that Microsoft's target age range of consumers (or users) of the Xbox platform is from 5 to 80 years old. Friedman Dep. at 68-5 to 68-14. Microsoft does not target business people or professionals in its marketing campaigns for the Kinect for Xbox. Friedman Dep., at 74. Instead, Microsoft is targeting retail consumers of virtually all ages by "offering an extraordinary new way to experience entertainment for me, my friends, and my family." Friedman Dep., at 85-23 to 86-4. Mr. Friedman further acknowledged that one of the marketing points for the Xbox platform was to "[c]onnect to friends and family when together or far apart." Friedman Dep. at 63-8 to 64-10).

In addition to marketing to families in general, Mr. Friedman testified that women were and remain a target audience for Kinect for Xbox 360. Friedman Dep. at 113-24 to 114-5. It should be noted that the consumers of the Xbox platform are comprised not only of

---

[3] As set forth in the deposition testimony of Friedman, the user is not required to share this information with all subscribers, but instead can select the people with whom he or she desires to share such information. Friedman Dep. at 22-23.

those consumers that purchased the devices themselves, but also the ultimate end users of such devices after they have been purchased and taken home. It is these ultimate end users who may continue to make purchases and generate revenue for Microsoft through subscriptions to Xbox Live and through the purchase of content, games and other offerings through Xbox Live. Friedman Dep. at 69-23 to 70-10; 70-11 to 71-13.

### 3.   Sources of Revenue.

Although he was not competent to testify on Microsoft's behalf with regard to the relevant financial information sought by Plaintiff, Mr. Friedman testified that Microsoft was able to recognize significantly increased revenues during 2010 from its release of Kinect for Xbox and a number of games such as Halo Reach. Friedman Dep. at 107-7 to 107-14.

Microsoft derives revenues from the Xbox platform not only from its sales of the Xbox hardware devices, but also through its sales of the following non-hardware offerings (hereinafter, "Ancillary Revenues"): (a) Xbox LIVE subscriptions, (b) sales of games (including games produced by third parties for use on the Xbox platform), and (c) consumer-based transactions through the Xbox LIVE service, including, but not limited to, game maps, game levels, avatar items, buying and renting TV shows or movies. Friedman Dep., at 107.

According to Microsoft's deposition testimony, the Ancillary Revenues realized by Microsoft would not be possible without the end users' purchase and use of the Xbox or Kinect for Xbox devices. Friedman Dep. at 122-123.

**D.      Perceived Meaning and Marketing Strategy Behind the Name "Kinect for Xbox."**

Microsoft claims that the word "Kinect" was primarily derived from the sensor's "kinetic" qualities.  *See* Microsoft Memorandum of Law at ¶4, 5.  However, within the documents produced by Microsoft is an internal, non-publicized document that clearly indicates that the product had only a "Secondary association with "energy" (as in kinetic)." Gallucci Decl., Exhibit S.

Despite Microsoft's contention above regarding the meaning of "Kinect," discovery has revealed, in a multitude of instances, that the use of the word "Kinect" was intended by Microsoft, and marketed by it in such a manner, to connote the ability to connect or interact with friends and family.

First, Mr. Friedman testified on behalf of Microsoft that he understood that the word "kin" means someone or something of the same or similar kind, a person's relatives collectively, or a group of persons constituting a family, clan, tribe or race.  Friedman Dep. at 35-11 to 35-19.  Indeed, the use of the word "kin" as defined above is within the standard vocabulary of the youngest consumers of the Microsoft's Xbox platform (*i.e.*, 5 year old children) in that first grade vocabulary includes the word "kin" but not "kinetic energy" or any derivation thereof.  Gallucci Decl., Exhibit II.  Mr. Friedman further testified that the word "kinect" sounds like the English word "connect." Friedman Dep. at 40-5 to 40-7.

Second, in an internal Microsoft document titled "'Agra Naming Brief" that was prepared for purposes of setting guidelines for the selection of the name of the Kinect sensor (then known as Agra), Microsoft never mentions the word "kinetic" or any variation thereof.

19

Instead, under the section titled "Target Audience Details" in the Agra Naming Brief, Microsoft indicates that "[t]he primary target audience for the Agra-based experiences will be a more casual player.  . . .  There are women in these groups and all of them show a tendency to want to play in social situations, most often with friends and family." Gallucci Decl., Exhibit N at 3.

The Agra Naming Brief also provides that the naming should not focus on the core gaming segments of users but instead the focus should be on the following 3 new target segmentations all of which have a common theme of connecting with ones kin:  Hyper Social, Hanging Out and Family Timer. *Id.* at 3.  The "Hyper Social" segment is comprised of "teens and younger woman who crave acceptance and **social interaction**" and that desire to "stay **connected** with large groups of people." *Id.* at 5.  The "Hanging Out" segment is comprised of teens and young adults "who are laid back and will go with the flow and join in what their **friends and family** want to do. . . . They tend to **play with family or one or two close friends** . . ."  The "Family Timer" segment "[t]end to be parents who **prioritize family** above all else" and these folks "[f]eel that technology is getting too complicated and frustrating." *Id.* at 5 (emphasis added).

Third, in Microsoft's internal document titled "Agra Name Recommendation", Microsoft indicated that one of the positive attributes of the "kinect" name was that it [b]rings the most inherent (positive) meaning of all names tested - "connect" connotations very strong in US and EMEA (with people, games, entertainment, etc.)." Gallucci Decl., Exhibit U.  In his deposition testimony pertaining to the connection between the words "kinect" and "connect," Mr. Friedman stated that "consumers and research made a connection between those two words." Friedman Dep., at 51-17 to 51-21.

Fourth, in Microsoft's internal E&D Client Input Document, Microsoft asserts that its desired perception of the Kinect for Xbox is as follows: "Xbox is for me. Kinect offers extraordinary new ways to experience entertainment for me, my friends and my family." Gallucci Decl., Exhibit P. In his deposition, Mr. Friedman acknowledged that it is "one of the current marketing strategies to market the Xbox 360 platform and the Kinect for Xbox 360 as offering an extraordinary new way to experience entertainment for me, my friends, and my family." Friedman Dep., at 85-23 to 86-4. Mr. Friedman further acknowledged that one of the marketing points for the Xbox platform was to "[c]onnect to friends and family when together or far apart." Friedman Dep. at 63-8 to 64-10.

Fifth, the name for the Kin phone was selected by Microsoft in January 2010. Blackham Dep. at 29-15 to 22. The name was selected by Microsoft because the word "kin" meant friends and family. Mr. Blackham testified that Microsoft chose the name "Kin" because it is short and memorable, and because it related to the concept of "next of kin" and those around you with whom you associated. Blackham Dep., at 52-21 to 53-6. In fact, Microsoft prepared an overview of the word "Kin" and what it brings to the minds of people who were part of research regarding the word. Among the key assets of the word were that it was associated with "social, friendly, connected, approachable, engaging, intimate, authentic." Blackham Dep. at 61-4 to 63-13; Gallucci Decl., Exhibit V. According to Microsoft, the term "Kin" further evokes the notion of being connected to the people close to you. Blackham Dep. at 63-10 to 63-22.

Further, based on Microsoft's own research through a third party known as Lexicon, in deciding to name the product "Kin", Microsoft chose the name because it was consistent with certain brand pillars and naming objectives, namely "connecting with others,

21

adventure, exploration, openness, honesty, socializing, and people first—me plus we" and

"an offering that is social and helps build social connectiveness." Blackham Dep. at 65-13 to

68-3; Gallucci Decl., Exhibit W.

Microsoft contends in its Memorandum of Law that "Microsoft's Kin mobile phones

have no connection with Microsoft's Kinect gaming sensor." *See* Friedman Affidavit in

Support of Microsoft's Motion for Summary Judgment, ¶ 11.  The products were never used

or sold together, and the names were chosen for different distinct reasons.  *Id.*  However,

these assertions are contradictory to statements made by Microsoft to the public at the time

of its acquisition of a company called Danger, Inc. (the developer of the mobile phone

device that Microsoft renamed the Kin Phone). Blackham Dep. at 93-23 to 94-18.  In a

press statement released by Microsoft on February 11, 2008, Microsoft stated that the

Danger-powered handsets provided functionality such as web browsing, instant messaging,

social networking, gaming and other functionality and that "[c]ombining these services with

Microsoft's connected entertainment and experiences technologies, including MSN, Xbox,

Zune, Windows Live and Windows Mobile, will provide Microsoft with the tools to

accelerate its work to create industry-leading entertainment and communication experiences

for consumers."  Gallucci Decl., Exhibit X.  In addition, Microsoft stated in that article that

it was adding Danger to its Entertainment and Devices Division, a division that per

Microsoft "develops and markets products and services designed to entertain and connect

people." *Id.*; *see also* Microsoft 2011 Annual Report at 7, attached to Gallucci Decl. as

Exhibit Y.  This Division within Microsoft is comprised solely of the Xbox Platform,

Windows Phone (which also interfaces with Xbox Live) and Media Center.  *Id.*

Microsoft engaged in advertising for the Kin phone on Xbox Live.  Blackham Dep. at p.84-18 to 87-19; Gallucci Decl., Exhibit Z.  Furthermore, the Kin phone connected to the Xbox so that a user could access their Xbox and Xbox Live from their Kin phone. Despite Xbox's denial of this fact, an article published by Xbox2theGamer on April 12, 2010 included a picture of the Kin Phone interface.  Gallucci Decl., Exhibit AA.  The pictured interface included a list of feeds from which the Kin Phone could receive information or data and one of the feeds in the list was "XBOX (4)."  *Id.*  Commenting on that picture, the author of the article stated:  "Something interesting we spotted into the KIN LOOP video was "XBOX" as one of the Feeds with the number (4) next to it.  I presume this means 4 new messages.  Could we finally be getting a phone that will communicate with Xbox Live friends with ease?"  Blackham Dep. at p. 82-9 to 84-14; Gallucci Decl., Exhibit AA. Notably, the Windows 7 phone Microsoft's new phone product launched after the Kin phone connects to a users' Xbox Live account.  Blackham Dep. at 102-18 to 103-3.

Sixth, Microsoft's 2011 Annual Report, page 7, states that the "Entertainment and Devices Division ("EDD") develops and markets products and services designed to entertain and **connect** people.  Gallucci Decl., Exhibit Y.  The Xbox 360 entertainment platform, including **Kinect**, is designed to provide a unique variety of entertainment choices for individuals and **families** through the use of our devices, peripherals, content, and online services."  *Id.* (emphasis added).  After acknowledging that the word "kin" means friends and family (Friedman Dep. at 72-10 to 72-12), the word "kinect" sounds like the word "connect" (Friedman Dep. at 72-3 to 72-5) and that the word "connect" means "to interact with other people in a variety of ways" (Friedman Dep. at 72-10 to 72-12), when asked whether an end user or consumer could believe that the word "kinect" was intended to

23

connote the ability to connect with friends and family, Mr. Friedman responded "I don't know." Friedman Dep. at 72-13 to 73-15.

When asked what the "x" was intended to connote in the word "Xbox," Mr. Friedman indicated that "[i]t's a letter of the alphabet" and offered no other intended meaning of the "x" in "Xbox." Friedman Dep. at 65-24 to 66-4. When asked how he would define the word "box," Mr. Friedman testified that it is "[a]n object that you put things in." Friedman Dep. at 66-6 to 66-10; *see also* Gallucci Decl., Exhibit BB, Graphic Summary of Friedman Testimony on Meaning. According to Microsoft, the Kinect for Xbox is never going to be marketed without the Xbox. Blackham Dep. at 25-22 to 27-24.

Microsoft waited until April 26, 2010 to file its application for trademark registrations with the U.S. Patent and trademark Office. Gallucci Decl., Exhibit CC at 3 (MS0001777). As of the date of this filing, the trademark "Kinect" for Xbox remains pending and is not a registered trademark. Notably, prior to its initial trademark application on April 26, 2010, on October 1, 2009, about 7 months earlier, Microsoft issued a report designed to uncover trademark rights that have a potential conflict with the trademark "Kinect" for Xbox. Gallucci Decl., Exhibit DD (MS 0002247). Based on Microsoft's production of documents in this action, no additional searches or reports were conducted after October 1, 2009. Since Plaintiff first applied for trademark protection on December 2, 2009, Microsoft's failure to conduct any additional searches would not have yielded a potential to conflict with plaintiff's goods, services, or mark. Toroian Declaration, Exhibit M.

Regarding the strength of its own mark, internal documents of Microsoft expressly stated that Kinect was a "good fit with Xbox because it is more suggestive than fanciful." Gallucci Decl., Exhibit T.

### E.    Kinbook's Fears of Confusion Are Realized in the Marketplace

Despite Microsoft's belief that this case is solely about the use of the term "Kin," Kinbook expressly testified that it is the combination of the terms "kin" and "box" with respect to the products at issue that is likely to cause confusion.  During her deposition Toroian testified as follows:

> Q:    Do you believe you're the only party that can use the term kin for any kind of social networking?
>
> A:    Again, I believe that the fact that my application was first rolled out on Facebook as our plan, and the similarity between a Kin phone packaged in a Kinbox, somebody buying that goes to Facebook and does a search, and Kinect for Xbox, which is also very heavily marketed through Facebook, yes, I do believe that all of those facts combined for me really has hampered my ability to do what we want to do with what we're developing.
>
> . . . .
>
> Q:    And if there are other parties that have used the term kin for social networking before you, are you prepared to cease use of kin?
>
> A:    It has to do with the phrase Kinbox, and the phrase Kinect for Xbox.  You say that ten times and see what comes out of your mouth.  It gets a little bit like a tongue twister.  It's very similar, it's not just the name kin.

Toroian Dep at 75-5 to 76-5.

Contrary to Microsoft's assertion, there is credible evidence of actual confusion in the marketplace. More specifically, an independent third-party website called ww.socialbakers.com, which tracks and keeps statistics about Facebook applications,

expressly tracks the "Kinect for Xbox 360 Facebook Statistics." Gallucci Decl., Exhibit E. Following a view of the statistics related to Kinect for Xbox, the site sets forth "Related applications" and the first "related" application displayed is Plaintiff's product "Kinbox." *Id.* at 2. Thus, an independent third-party is linking Plaintiff's Kinbox and Microsoft's Kinect for Xbox as being related products – express evidence of confusion.

Further, a third-party website found at www.overclock.net contained blog postings following Microsoft's announcement that Xbox is not a gaming console. Gallucci Decl., Exhibit FF. In opining as to a new integrated name for the Kinect for Xbox and the Xbox, one blogger wrote "It will more and likely have the Kinect built in, so they will have to relate the names. **Kinbox**, Kinectbox, Paperbox, Xweight, Paperweight . . . I'm so excited I just can't wait!" Gallucci Decl., Exhibit FF (emphasis added).

On Kinboards.com, this third-party website sought reader/blogger feedback on the topic "MS Launches Kinect for Xbox. Kin More than Just a Phone?" Gallucci Decl., Exhibit GG. The website sought theories from readers/bloggers by way of informal survey as to the correlation between the Kin phone, Kinect for Xbox and the Xbox. *Id.* at 2. One blogger, Brian Kealing, posted his belief as part of the survey that "Kinect is no spelling error – Kin and KINect were purposefully made to be similar in name. . . . Kinect is the bridge between Kin and Xbox 360. . . . Kinect brings Kin and Xbox together." Gallucci Decl., Exhibit GG at 2. Accordingly, if this is the perception of members of the public that the Kinect brings "Kin" and "Xbox" together, the integration of those names results in Plaintiff's trademark, namely, Kinbox.

In addition, in a PC Magazine article regarding the Kin phone, the article describes that the Kin phone came in an unusual cylindrical box known as a "Kin box." Blackham

Dep. at 88-18 to 90-3; Gallucci Decl., Exhibit HH.   Whether or not Microsoft marketed the phone using the phrase "Kinbox" is irrelevant as a third-party consumer magazine used the term and there is no evidence that Microsoft did anything to correct this public perception. *Id.*

## IV.    ARGUMENT.

### A.    Summary Judgment Standard

In order to prevail on a motion for summary judgment, the movant must show that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment may be granted only if the moving party persuades the court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the moving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988); *Huggins v. Coatesville Area School District*, Nos. 07-4917, 09-1309, slip op. 2010 WL 4273317 at \*5 (E.D. Pa. Oct. 29, 2010). An issue is genuine if a reasonable jury could possibly hold in favor of the non-moving party with regard to that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

The Court's function in deciding a summary judgment motion is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id.* at 249; *Walden v. Saint Gobain Corp.*, 323 F.Supp. 637, 641 (E.D. Pa. 2004). In evaluating a motion for summary judgment, the court "must view the facts most favorable to the non-moving party," and make every reasonable inference in that party's favor. *See Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Huggins*, 2010 WL 4273317, at \*5.

Summary judgments are disfavored and are the exception in trademark actions. *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1062-63

("(f)ailure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception"); *see also Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006) (summary judgment reversed in trademark infringement case because of the existence of numerous issues of material fact). The reason expressed by courts for rarely granting summary judgment in trademark cases is that the ultimate issue, the question of likelihood of confusion, is inherently factual and is routinely submitted for jury determination as a question of material fact. *See, e.g., Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356, n. 5 (9th Cir.1985). In determining a summary judgment motion, particularly in a trademark case, rather than weigh the evidence and determine the truth itself, a District Court should identify undisputed facts and resolve the remaining disputed facts in favor of the non-movant. *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008).

In this matter, Microsoft has failed to meet its burden to show that there is no genuine issue of any material fact and that it is entitled to judgment as a matter of law. Rather, in this trademark action under the Lanham Act, the factors to be weighed, including those relevant to the likelihood of confusion, are inherently factual, not susceptible to summary judgment and routinely submitted for determination by a jury. As set forth below, Plaintiff has identified numerous genuine issues of material fact precluding summary judgment. Accordingly, Microsoft's motion for summary judgment, presented prior to the end of fact discovery in this matter, should be denied in its entirety.

### B. Genuine Issues of Material Fact Exist as to whether Microsoft is Liable for Reverse Trademark Infringement Precluding Summary Judgment

This Circuit recognizes reverse confusion claims under Section 43(a) of the Lanham

Act. *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 474 (3d Cir. 1994).

"'Reverse confusion occurs when a larger, more powerful company uses the trademark of a

smaller, less powerful senior owner and thereby causes likely confusion as to the source of

the senior user's goods or services.' Thus the 'junior' user is junior in time but senior in

market dominance or size." *Freedom Card, Inc.v. JP Morgan Chase & Co.,* 432 F.3d 463,

471 (3d Cir. 2005) (quoting *Fisons Horticulture,* 30 F.3d at 474).  The Third Circuit has

explained reverse confusion further as follows:

> In reverse confusion, the junior user saturates the market with
> a similar trademark and overwhelms the senior user.  The
> public comes to assume the senior user's products are really
> the junior user's or that the former has become somehow
> connected to the latter.  The result is that the senior user loses
> the value of the trademark -- its product identity, corporate
> identity, control over its goodwill and reputation, and the
> ability to move into new markets.

*Id.* at 471 (quoting *Fisons Horticulture,* 30 F.3d at 474-75).

Another such instance of reverse confusion arises when a prospective consumer

might conclude that the senior user was imitating the larger junior user.  *Tanel Corp. v.*

*Reebok International, Ltd.* 774 F. Supp. 49, 57 (D. Mass. 1990) (finding likelihood of

reverse confusion and granting preliminary injunction in connection with the mark "360'".

Accordingly, "the doctrine of reverse confusion is designed to prevent . . . a larger more

powerful company usurping the business identity of a smaller senior user." *Commerce*

*National, Ins. v. Commerce Insurance Agency, Inc.,* 214 F.3d 432, 445 (3d Cir. 2000).

To prove trademark infringement and unfair competition under the Lanham Act,

whether by direct or reverse confusion, Plaintiff Kinbook must prove: (1) it owns the

Kinbox mark; (2) the mark is valid and legally protectable; and (3) Microsoft's use of its

mark to identify goods or services is likely to create confusion. *Checkpoint Systems, Inc. v. Checkpoint Software Technologies, Inc.*, 269 F.3d 270, 279 (3d Cir. 2001). Microsoft does not dispute Plaintiff Kinbook's ownership of the "Kinbox" mark. Therefore, only the issues of whether Kinbook has a protectable mark and whether Microsoft's marks and use of its marks are likely to cause confusion are the subject of the current motion. [4]

### 1.  Plaintiff Kinbook Has A Valid and Protectable Mark.

In support of its motion for summary judgment, Microsoft argues that Plaintiff's mark "Kinbox" is merely descriptive and, therefore, not inherently distinctive thereby affording trademark protection. *See* Microsoft Memorandum of Law at 13. In an effort to obfuscate this issue of the case, Microsoft ignores Plaintiff's actual mark, "Kinbox," and focuses on the single word "kin" in support of its argument that Plaintiff's mark is descriptive or generic. *Id.* at 15. For the reasons set forth below, Kinbox is a suggestive mark making in inherently distinctive and a protectable trademark.

The Third Circuit has recognized that trademarks may fall within one of four categories: arbitrary (or fanciful) terms (which bear no logical or suggestive relation to the actual characteristics of the goods or services); suggestive terms, (which suggest rather than describe the characteristics of the goods or services); descriptive terms, (which describe the characteristic or ingredient of the article to which it refers); and generic terms (which

---

[4] Microsoft claims that plaintiff has not specifically plead a claim for trademark infringement. Notably, however, there is no question that a claim for trademark infringement has been plead (*see*, Complaint Count I) and the evidence for a claim of direct confusion and reverse confusion largely overlap. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 229 (3d Cir. 2000). Further, under Federal Rule 15(b), plaintiff can always amend the pleadings to conform to the evidence and as this is defendant's motion for summary judgment there can be no prejudice to defendant. *See Evans Products Co. v. West American Ins. Co,*, 736 F.2d 920, 924 (3d Cir. 1984) (court shall permit the pleadings to be amended to conform to the evidence when presentation of merits of the action will be subserved).

function as the common descriptive name of a product class. *Express Servs., Inc. v. Career Express Staffing Servs.*, 176 F.3d 183 (3rd Cir 1999).

The distinction between suggestive and descriptive terms is hardly clear. *Dranoff-Perlstein Assoc. v. Sklar*, 967 F.2d 852, 855 (3d Cir. 1992). Most courts rely upon the following "imagination" test to determine whether a term is suggestive or merely descriptive:

> A term is suggestive if it requires imagination, thought, or perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Id.* at 858 (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986)). Further, the fact that a word is common does not necessarily make it weak or unworthy of trademark protection. *Fison's Horticulture*, 30 F.3d at 478. "'The significant factor is not whether the word itself is common, but whether the way the word is used in a particular context is unique enough to warrant trademark protection.'" *Id.*(quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 n.4 (6th Cir. 1988)). Indeed, "[t]he word 'shell,' 'camel,' and 'apple' are not uncommon, but they are arbitrary when applied to gasoline, cigarettes and computers. *Id.*

Here, contrary to Microsoft's contention, Plaintiff's "Kinbox" mark is, at the very least, suggestive if not arbitrary or fanciful. As set forth above, in May 2009, Kinbook engaged in the process of developing a specific on-line social networking software application designed for the sharing of information such as online messages, photos and videos between and among family members. Toroian Dep. at 47-21 to 49-22. The product and the mark at issue "Kinbox" (not merely "Kin") is an online "multi-functional Facebook application . . . that allows friends and family members to interact with one another, share

31

pictures, create profiles of members who have passed away, share family recipes, and over time, much more." Toroian Decl., Exhibit H at 1. A Kinbox member is afforded the ability to upload pictures, videos and other content either from such users' Facebook account or directly upload content to the Kinbox without the obligation of sharing such information with the overall Facebook profile. *Id.* at 2; *see also* Toroian Dep. at 100-4 to 7; Toroian Decl., Exhibit G at 8. While the product does, indeed, provide for the connecting of friend and family through online social networking functions, at best the term Kinbox suggests rather than describes the characteristics of the application. Microsoft's dissection of the mark "Kinbox" into two separate words, "Kin" and "box", while ignoring the fact that they are combined in Plaintiff's mark, is unavailing.

In *Sabina Corporation v. Creative Compounds, LLC,* 609 F.3d 175, 180 (3d Cir. 2010), the plaintiff made unfair competition claims associated with its mark "ForsLean" against its competitor for use of the mark "Forsthin" in connection with the sale of weight loss products containing a plant root extract known as "Coleus forskohlii." The Court reversed the district court's judgment in favor of the defendant and entered judgment in favor of the plaintiff on plaintiff's infringement claim. *Id.* at 190. As part of its decision, in determining the strength of plaintiff's mark, the Court specifically rejected the district court's finding that the term "fors" was an abbreviation of the generic term of the product and that the mark ForsLean was a generic or descriptive term. *Id* at 185. In reaching this decision, the Court analogized the ForsLean Mark to V-8 stating, "the 'V' in V-8 stands for 'vegetable' and the '8' stands for the fact that the juice has eight vegetables, but V-8 is still an arbitrary term. *Id; see also Fison's Horticulture,* 30 F.3d at 479 (finding that while term "Fairway" is not uncommon, it likely ranked between arbitrary and suggestive when applied

to peat moss); *Express Servs., Inc. v. Career Express Staffing Servs.*, 176 F.3d 183 (3rd Cir 1999) (reversing district court's judgment in favor of defendant and the term "express" to the provision of employment agency services without interposing considerable imagination or modification).

Here, applying the "imagination" test, the mark "Kinbox" without question requires imagination, thought or perception to reach the conclusion that the nature of the goods it represents constitutes "an online "multi-functional Facebook application . . . that allows friends and family members to interact with one another, share pictures, create profiles of members who have passed away, share family recipes, and over time, much more." Toroian Decl., Exhibit H at 1. In this context the mark is arbitrary or suggestive when applied to online social networking software applications that allow friends and family to connect with one another through various media.

Finally, the issue of the characterization of Plaintiff's mark "Kinbox" is a genuine issue of material fact that precludes the granting of summary judgment at this juncture. *See Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 292 n. 18 (3d Cir. 1991) (the characterization of a mark is a factual issue for the jury). For these reasons, Kinbox is a protectable mark and Defendant Microsoft's motion for summary judgment should be denied.

2.       **Microsoft's Use of "Kinect for Xbox" is Likely to Cause Confusion with Plaintiff's "Kinbox" Mark.**

In *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000), the Third Circuit detailed the steps involved in any likelihood of confusion analysis and enumerated various factors that have since become the touchstone of all likelihood of confusion inquiries. The court stated that "no single factor is

dispositive." *A&H Sportswear, Inc.,* at 216. In finding a likelihood of confusion, the court

need not have a positive finding on a majority of the factors. Instead, these factors are

simply a guide to help determine whether confusion would be likely between the two users

of the contested mark. *Id.*

In a reverse confusion case, the court looks to the following factors, known as the

*Lapp* factors, to determine whether a likelihood of confusion exists, namely:

> (1) similarity of the marks; (2) the strength of the two marks, weighing both a
> commercially strong junior user's mark and a conceptually strong senior user's mark
> in the senior users favor; (3) the price of the goods and other factors indicative of the
> care and attention expected of consumers when making a purchase; (4) the length of
> time the defendant has used the mark without evidence of actual confusion; (5) the
> intent of the defendant in adopting the mark; (6) the evidence of actual confusion;
> (7) whether the goods are marketed or advertised through the same channels of trade
> and advertised through the same media; (8) the extent to which the targets of the
> parties' sales efforts are the same; (9) the relationship of the goods in the minds of
> consumers, whether because of near-identity of the products, the similarity of
> function or other factors; and (10) other factors suggesting that the consuming public
> might expect the larger more powerful company to manufacture both products, or
> expect the larger company to manufacture a product in plaintiff's market, or expect
> that the larger company is likely to expand in the plaintiff's market.

*Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F.3d 463, 473 (3d Cir. 2005) (*citing A*

*& H Sportswear, Inc,* 237 F.3d at 234). Economic reality and common sense require that

some of the *Lapp* factors be analyzed differently in a reverse infringement case. *Id.* at 472.

Accordingly, the strength of the parties' marks (factor 2), the intent in adopting the marks

(factor 5), and the evidence of actual confusion (factor 6) are analyzed differently from the

method employed in a typical direct confusion case. *Id.*

### a.   Similarity of the Marks.

In its claim that Plaintiff's "Kinbox" mark and Microsoft's "Kinect for Xbox" mark

are not similar, Microsoft ignores the dominant portions of both marks, namely the terms

"kin" and box" appearing together.  While Microsoft recites the relevant case law, such law is misapplied when viewing the two marks for similarity as part of Microsoft's effort to foist *its own* theory of Plaintiff's case on the Court.   More specifically, Microsoft consistently and erroneously attempts to convince the Court that the mark Plaintiff seeks to protect is the term "kin" only rather than the mark it is actually seeking to protect, namely "Kinbox," Plaintiff's registered trademark.  Indeed, Microsoft's argument is internally inconsistent as it asserts that its mark is solely "Kinect," but then goes on to admit that the Kinect is always marketed as the Kinect for Xbox.  *See* Microsoft Memorandum of Law at 21-22.   Further, according to Microsoft, the Kinect for Xbox is never going to be marketed without the Xbox.  Blackham Dep. at 25-22 to 27-24.

Similarity of marks has been held to be one of the most important factors, if not the most important factor, in determining likelihood of confusion.  *A&H Sportswear, Inc.*, 237 F.3d at 216.  The test for such similarity is whether the labels create the same overall impression when viewed separately.  *Id.*  Side-by-side comparison of the two marks is not the proper method for analysis when the products are not usually sold in such a fashion.  *Id.* "The fact that there may be some differences in what the two names suggest is not alone enough to conclude that the names are not confusingly similar." *Fisons Horticulture*, 30 F.3d at 476. A user "may not avoid likelihood of confusion by appropriating another's entire mark and adding descriptive or non-descriptive matter to it." *Id.* at 477 (citing J. Thomas McCarthy, *2 McCarthy on Trademarks and Unfair Competition*, § 23:15[8] at 23-102 (3d ed. 1992)).  Moreover, when the dominant portions of the two marks are the same, confusion is likely.  Courts must "compare the appearance, sound, and meaning of the marks." *Checkpoint Systems, Inc.*, 269 F.3d at 281-82.

35

Here, comparing the appearance, sound, and meaning of the Kinect for Xbox mark to the Kinbox mark supports the conclusion that the marks are confusingly similar. In analyzing the mark "Kinect for Xbox," the dominant terms are "Kin" and "box" and the other expressions, namely, "ect," "x" and "for," are merely descriptive or non-descriptive matter the addition of which does not avoid the likelihood of confusion resulting from Microsoft's misappropriation of plaintiff's mark. *See Checkpoint Systems, Inc.*, 269 F.3d at 281-82 (Court held that because "Systems," "Software," "Technologies," and "Inc.," are generic or descriptive terms, their addition to the dominant terms "check" and "point" would not lead the average consumer to disassociate the products).

The dominant term "Kin" has had some significance within Microsoft in that it has thus far been used by Microsoft for two heavily marketed products, the Kinect for Xbox and the Kin Phone. As set forth above, Mr. Friedman testified on behalf of Microsoft that he understood that the word "kin" means someone or something of the same or similar kind, a person's relatives collectively, or a group of persons constituting a family, clan, tribe or race. Friedman Dep., at 35-11 to 35-19. Indeed, the use of the word "kin" as defined above is within the standard vocabulary of the youngest consumers of the Microsoft's Xbox platform (*i.e.*, 5 year old children) in that first grade vocabulary includes the word "kin" but not "kinetic energy" or any derivation thereof. Gallucci Decl. Exhibit II.

Further, the name for the Kin phone was selected by Microsoft because the word "kin" meant friends and family. Mr. Blackham testified that Microsoft chose the name "Kin" because it is short and memorable, and because it related to the concept of "next of kin" and those around you with whom you associated. (Blackham Dep., at 52-21 to 53-6). In fact, Microsoft prepared an overview of the word "Kin" and what it brings to the minds of

people who were part of research regarding the word.  Among the key assets of the word were that it was associated with "social, friendly, connected, approachable, engaging, intimate, authentic." Blackham Dep., at 61-4 to 63-13; Gallucci Decl., Exhibit V. According to Microsoft, the term "Kin" further evokes the notion of being connected to the people close to you.  Blackham Dep. at 63-10 to 63-22.

Further, based on Microsoft's own research through a third party known as Lexicon, in deciding to name the product "Kin," Microsoft chose the name because it was consistent with certain brand pillars and naming objectives, namely "connecting with others, adventure, exploration, openness, honesty, socializing, and people first—me plus we" and "an offering that is social and helps build social connectiveness." Blackham Dep. at p. 65-13 to 68-3; Gallucci Decl., Exhibit W.

The addition by Microsoft of the extension "ect" to the dominant term "Kin" to form "Kinect" is merely descriptive matter and was intended to portray the ability of an end user to connect with friends and family (*i.e.*, kin) through the Xbox platform.  Mr. Friedman testified that the word "kinect" sounds like the English word "connect." Friedman Dep. at 40-5 and also acknowledged that the word "connect" means "To interact with other people in a variety of ways." Friedman Dep., at 40-2.  "Connect connotation is very strong." Gallucci, Decl., Exhibit V and Friedman Dep. at 51-13.  After acknowledging that the word "kin" means friends and family (Friedman Dep. at 72-10 to 72-12), the word "kinect" sounds like the word "connect" (Friedman Dep. at 72-3 to 72-5) and that the word "connect" means "to interact with other people in a variety of ways" (Friedman Dep. at 72-10 to 72-12), when asked whether an end user or consumer could believe that the word "kinect" was intended to connote the ability to connect with friends and family, Mr. Friedman responded

"I don't know." Friedman Dep. at 72-13 to 73-15. The fact that Microsoft's Director of Global Marketing and Microsoft's corporate designee did not know the potential interpretation by a consumer of a product name that he helped name and/or market strongly suggests that a material fact exists as to the likelihood for confusion and a reason why Microsoft's Motion for Summary Judgment should be dismissed.

When asked what the "x" was intended to connote in the word "Xbox," Microsoft's corporate designee indicated that "[i]t's a letter of the alphabet" and offered no other intended meaning of the "x" in "Xbox." *See* Friedman Dep., at 65-24 to 66-4. When asked how he would define the word "box," Mr. Friedman testified that it is "[a]n object that you put things in." *See* Friedman Dep. at 66-6 to 66-10; *see also* Gallucci Decl., Exhibit BB, Graphic Summary of Friedman Testimony on Meaning. Accordingly, adding "x" is merely non-descriptive matter added to the dominant term "box."

Applying all of the relevant testimony of Microsoft's corporate designees, it is amply demonstrated that the connotation (?) of the term "Kin" is being "connected" to the term "box" as the "x" is just a letter with no meaning. Accordingly, the two dominant portions of the parties' marks are confusingly similar.

### b.    Strength of the Marks.

Microsoft argues that Plaintiff's Kinbox mark is "weak" because it contains the term "kin" and that numerous third-parties are using the term as part of their brands for products and services. Microsoft Memorandum of Law at 22-26. In support of its argument, Microsoft once again sets forth a laundry list of websites and products that use the term "Kin" as a portion of their name but, notably, do not use both the terms "Kin" and "box" or any variation thereof.

38

In evaluating the strength of Kinbook's mark, Kinbox, in a reverse confusion case, a court must examine: (1) the mark's distinctiveness or conceptual strength (the inherent features of the mark); and (2) its commercial strength. *Freedom Card, Inc.*, 432 F.3d at 472. It follows that if a mark is suggestive it is entitled to a higher level of protection, at least in those geographic and product areas in which the senior user applies the mark to the goods. *Fisons Horticulture, Inc*, 30 F.3d at 478. The strength of the mark for reverse confusion weighs in favor of plaintiff because defendants have greater commercial strength from their more extensive marketing. Thus, in a reverse confusion claim, the court should analyze the 'commercial "strength" factor in terms of the commercial strength of the junior user as compared to the senior user, and any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark. *Freedom Card, Inc.*, 432 F.3d at 472.

Regarding the commercial strength of the mark within the context of a reverse confusion claim, there is no question that Microsoft possesses greater commercial strength than Kinbook when marketing its Kinect for Xbox, and that Microsoft has completely saturated the market with its confusingly similar mark by way of an extraordinary amount of advertising. First, regarding the comparable commercial strengths, Kinbook had originally intended to spend a minimum of $250,000 marketing the Kinbox application prior to Microsoft's actions. Toroian Dep. at 112-10 to 19. Kinbook, however, has had to alter its timeline as to rolling out Kinbox in any larger fashion because Microsoft had already spent significant sums of money in its marketing campaign. Toroian Dep. at 45-20 to 46-5.

Despite Kinbook's first-in-time registration of its mark Kinbox, "a company the size of Microsoft could afford to spend hundreds of millions of dollars in a marketing campaign

so that it would envelop anything that I was trying to do." Toroian Dep at 94-13 to 21. This, in turn, diminished any goodwill that Kinbox was beginning to obtain in the marketplace. *Id.* at 94-22 to 95-5. Nevertheless, Kinbook did spend a few thousand dollars on advertising by way of banner ads. *Id.* at 246-1 to 23.

The market's response to Microsoft's marketing and re-launch of Xbox with Kinect for Xbox was better than they expected. Pursuant to Microsoft's Press Release "2010: The Biggest Year in Xbox History" published January 11, 2011, Microsoft stated that "[w]e predicted that we would sell 5 million Kinect sensors by the end of holiday. So how did we do? Well, we beat our forecast. In the first 60 days, we've sold 8 million Kinect sensors worldwide." Gallucci Decl., Exhibit M. Finally, while Microsoft has failed to produce documents necessary to determine revenues, profits and losses, advertising and promotion expenses, and net income associated with the Kinect for Xbox, *see* Gallucci Decl., Exhibit I, among the paucity of documents Microsoft did produce is evidence that in Fiscal Year 2010 Microsoft spent $29,669,811 on advertising media, advertising production, and production materials in connection with the Kinect for Xbox and in Fiscal Year 2011 has spent $107,709,440 on these items. Gallucci Decl., Exhibit LL. These amounts are staggering when compared to what a small, two-person, female-owned company can afford to spend on advertising its product and mark. Accordingly, this factor weighs in favor of Kinbook and its mark, Kinbox.

### c.   Sophistication of Consumers

Microsoft claims that customers of the Kinect for Xbox are sophisticated based solely on the notion that the Kinect for Xbox is "relatively expensive." Microsoft

Memorandum of Law at 26-27.  Such statements completely contradict the testimony of Microsoft's corporate designee when asked about the target markets and age of consumers.

Courts have adopted the general proposition that the average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive products. *Gray v. Meijer, Inc.,* 295 F.3d 641, 649 (6th Cir. 2002); *see also, e.g., Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.,* 748 F.2d 669, 672 (Fed.Cir. 1984) (holding that purchasers of relatively inexpensive products should be held to a lesser standard of purchasing care).

Moreover, "when the purchasing class is mixed, courts normally do not hold the general class to a high standard of care." *Checkpoint Systems,* 269 F.3d at 284-85 (citing *Ford Motor Co. v. Summit Motor Prods.,* 930 F.2d 277, 293 (3d Cir. 1991)) ("When the buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class.").   "If there is evidence that both average consumers and specialized commercial purchasers buy goods, there is a lower standard of care because of the lack of sophistication of some of the relevant purchasers. *Id.*

Here, although Microsoft's Kinect for Xbox can range from $150 to $300 (*see* Microsoft Memorandum of Law at 26), there are also a plethora of other items that can be purchased with the Kinect for Xbox and through the Xbox platform such as subscriptions, content and games that have a much lower cost and typically under $60.  Pursuant to Microsoft's 2011 Annual Report: "The Xbox 360 entertainment platform, including Kinect, is designed to provide a unique variety of entertainment choices for individuals and families through the use of our devices, peripherals, content and online services." Gallucci Decl., Exhibit AA.

Comparatively, even at $150 to $300 for the purchase of the hardware, this is relatively inexpensive rather than expensive as Microsoft claims. *Cf. Checkpoint Systems,* 269 F.3d at 285-86 (affirming district court's finding that plaintiff's and defendant's security and surveillance equipment were expensive and purchasers of such equipment were highly sophisticated).

Perhaps most importantly, Microsoft's corporate designee, Eli Friedman, testified that Microsoft's target age range of consumers (or users) of the Xbox platform is from 5 to 80 years old. Friedman Dep. at 68-5 to 68-14). Microsoft does not target business people or professionals in its marketing campaigns for the Kinect for Xbox. Friedman Dep. at 74. Instead, Microsoft is targeting retail consumers of virtually all ages by "offering an extraordinary new way to experience entertainment for me, my friends, and my family." Friedman Dep. at 85-23 to 86-4. Thus, contrary to Microsoft's contention, the least sophisticated consumer of its products, content and services is a mere 5 years of age and Microsoft admits that it does not target business people or professionals in its marketing campaigns. For these reasons, this factor weighs in favor of Plaintiff and summary judgment should be denied.

        **d.**      **Microsoft's Intent in Adopting the "Kinect for Xbox" Mark.**

In support of this factor, Microsoft asserts that it did not have any specific intent to cause confusion or to create any association between its mark, Kinect for Xbox, and the mark of Plaintiff, Kinbox. Notably, however, Microsoft misstates the law regarding its intent in the context of a reverse confusion claim.

42

The intent of the alleged infringer is analyzed differently in a reverse confusion case than in a forward confusion case. Because the defendant in a reverse confusion case by definition is not palming off or otherwise attempting to create confusion as to the source of its product, requiring proof that the infringer intended to trade off the good will of the senior user is inconsistent with the concept of reverse confusion and is not a necessary element to recovery. *Altira Group, LLC v. Philip Morris Companies, Inc.,* 207 F.Supp.2d 1193, 1199-1201 (D. Colo. 2002). Instead, the inquiry is whether the defendant acted with carelessness, indifference or otherwise culpable conduct in deciding to use the infringing mark. *Id.* A defendant acts with carelessness, indifference or otherwise culpable conduct when it fails to conduct a thorough search for similar marks or when it fails to make a good faith effort to determine whether its mark will conflict with another. *Id.* at 1200-01. The questions a district court should consider are whether the defendant conducted an adequate name search for other companies marketing similar goods under similar marks and whether it followed through with this investigation when it found there were such companies. *Fisons Horticulture, Inc.,* 30 F.3d at 480.

As set forth above, Microsoft waited until April 26, 2010 to file its application for trademark registrations with the U.S. Patent and Trademark Office. Gallucci Decl., Exhibit EE, at 3 (MS0001777). As of the date of this opposition, the Trademark "Kinect" for Xbox remains pending and is not a registered trademark. Notably, prior to its initial trademark application on April 26, 2010, on October 1, 2009, about 7 months earlier, Microsoft issued a report designed to uncover trademark rights that have a potential conflict with the trademark "Kinect" for Xbox. Gallucci Decl., Exhibit FF (MS 0002247). Based on Microsoft's production of documents in this action, no additional searches or reports were

conducted after October 1, 2009.   Since Plaintiff first applied for trademark protection on

December 2, 2009, Microsoft's failure to conduct any additional searches would not have

yielded a potential to conflict with Plaintiff's goods, services, or mark.   Toroian

Declaration, Exhibit M.

Conducting one search so far in advance of any actual effort to register its Kinect for

Xbox mark or launch its product rises to the level of carelessness in a reverse confusion

case.   As a result, Kinbook is able to demonstrate the requisite element of intent in a reverse

confusion case and this factor weighs in Kinbook's favor.

<strong>e.   Evidence of Actual Confusion.</strong>

As set forth above in section IV.A., summary judgment is disfavored in trademark

infringement cases under the Lanham Act primarily because the question of likelihood of

confusion, the ultimate issue in such cases, is inherently factual. *See, e.g., Checkpoint*

*Systems,* 269 F. 3d at 301; *A & H Sportswear,* 237 F.3d at 237 ("the question of likelihood

of confusion is ultimately one of fact…").   One of the factors to be considered in

determining likelihood of confusion is evidence of actual confusion.

Microsoft addresses the evidence of actual confusion factor by simply stating that

there is no evidence of any actual confusion in this matter. *See* Microsoft Memorandum of

Law at p. 28. However, in making this bald assertion, Microsoft ignores two important facts:

1) evidence of actual confusion is not required to prove likelihood of confusion, and 2) as

set forth in detail in Plaintiff's Statement of Facts above, Plaintiff does have evidence of

actual confusion.

Evidence of actual confusion is not required to prove likelihood of confusion. *See*

*Versa Prods.*, 50 F.3d at 205; *Fisons,* 30 F.3d at 476 ("while evidence of actual confusion

44

would strengthen plaintiff's case, it is not essential."); *Daddy's Junky Music Stores v. Big Daddy's Family Music Center*, 109 F.3d 275, 284 (6th Cir. 1997) ("a successful Lanham Act plaintiff only must show a sufficient potential of confusion, not actual confusion.") . Courts have recognized that it is difficult to find evidence of actual confusion because many such instances go unreported. *Checkpoint Systems*, 269 F.3d at 291; *see also Brookfield Communications, Inc. v. West Coast Entertainment Corporation*, 174 F.3d 1036, 1050 (9th Cir. 1999) ("(t)he failure to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy.") (emphasis in original). *As* such, any evidence of actual confusion is highly probative of likelihood of confusion. *See Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 612 (7th Cir. 1965) ("Since reliable evidence of actual confusion is difficult to obtain in trademark and unfair competition cases, any such evidence is substantial evidence of likelihood of confusion.").

Even though evidence of actual confusion is not required to prove the likelihood of confusion in the Third Circuit, Plaintiff has nonetheless presented credible evidence of actual confusion herein. *See* pp. 25-26. For instance, an independent third-party website known as www.socialbakers.com, which tracks and compiles statistics about Facebook applications, including "Kinect for Xbox 360 Facebook Statistics", specifically identifies Plaintiff's product Kinbox as a "related application" to Kinect for Xbox. Gallucci Decl., Exhibit EE. Another third-party website, www.overclock.net, contains blog postings regarding a potential integrated name for the Kinect for Xbox and the Xbox 360. One blogger raised the name of Plaintiff's product, Kinbox, as a potential integrated name for these two components of the Xbox Platform. Gallucci Decl., Exhibit FF. Additionally, on

kinboards.com, the owners of this independent website sought blogger feedback on the correlation between the Kin phone, the Kinect for Xbox and the Xbox. One blogger posted the following: "Kinect is no spelling error—Kin and Kinect were purposefully made to be similar in name. ...Kinect is the bridge between Kin and Xbox 360. ...Kinect brings Kin and Xbox together." Gallucci Decl., Exhibit GG. With regard to the Kin phone, a PC magazine article describes that the Kin phone was packaged in an unusual cylindrical box known as a "Kin box." Blackham Dep. at 88-18 to 90-3; Gallucci Decl., Exhibit HH.

Each of the instances listed above is evidence of actual confusion between Microsoft's Xbox Platform and Plaintiff's Kinbox and, therefore, is highly probative as to the ultimate issue of the likelihood of confusion. However, even if the Court determines that such evidence of actual confusion is not credible or somehow inadequate, at the very least, such evidence presents a genuine issue of material fact sufficient to defeat Microsoft's summary judgment motion.

> **f.      Length of Time Defendant Has Used Kinect for Xbox Without Evidence of Actual Confusion.**

Microsoft contends that this *Lapp* factor somehow weighs in its favor because "there has been absolutely no evidence of anyone confusing Microsoft or its products with Plaintiff or its services." *See* Microsoft Memorandum of Law at 27.   In doing so, Microsoft ignores the multiple instances of actual confusion cited by Plaintiff herein and the evidence attached as Exhibits EE to HH to the Gallucci Decl. In any event, the "evidence of actual confusion" factor and this factor, "the length of time the defendant has used the mark without evidence of actual confusion arising", are frequently analyzed together. *See, e.g., Checkpoint Systems*, 269 F.3d at 291; *Versa Prods.*, 50 F.3d at 205.   Accordingly, with regard to the latter factor,

Plaintiff relies on Section IV.B.2 (f), *supra,* detailing evidence of actual confusion herein

and the appropriate standard for evaluating same.

> **g.**   **Kinbox and Kinect for Xbox Are Marketed**
> **Through Same Channels of Trade and Advertised**
> **Through Same Media.**

Microsoft attempts to minimize its overpowering market strength by asserting that

Plaintiff only market its product on Facebook and that the fact that both parties market via

the internet should be afforded little weight. Microsoft Memorandum of Law at 28-29.

Nevertheless, "because both parties maintain websites and solicit business via the Internet,

the overlap in marketing channels weighs in plaintiffs favor." *First Franklin Financial*

*Corp. v. Franklin First Financial, Ltd.,* 356 F. Supp. 2d 1048, 1052 (N.D. Cal. 2005).

As stated previously regarding the commercial strength of the Kinbox mark,

Kinbook had originally intended to spend a minimum of $250,000 marketing the Kinbox

application prior to Microsoft's actions. Toroian Dep. at 112-10 to 19. Kinbook, however,

has had to alter its timeline as to rolling out Kinbox in any larger fashion because Microsoft

had already spent significant sums of money in its marketing campaign. Toroian Dep. at

45-20 to 46-5. Indeed, these sums are extraordinary. In Fiscal Year 2010 Microsoft spent

$29,669,811 on advertising media, advertising production, and production materials in

connection with the Kinect for Xbox and in Fiscal Year 2011 has spent $107,709, 440 on

these items. Gallucci Decl., Exhibit LL. Finally, it is without question that not only do both

parties market via the internet, but Microsoft's markets and advertises its Kinect for Xbox

specifically on Facebook, the only place Plaintiff has been able to cost-effectively market its

product. Gallucci Decl., Exhibit YY. This undercuts Microsoft's claim that it only markets

the Kinect for Xbox through "electronic stores and on Microsoft's website." Microsoft

Memorandum of Law at 29. Moreover, in its "E&D Client Input Document" for the "Kinect Digital Campaign (Platform)," Microsoft states that "[t]he platform digital campaign for Kinect will consist of numerous online adds, a destination site, and a massive social media campaign." Gallucci Decl., Exhibit P at 1.

Indeed, according to Microsoft, the "massive social media campaign," involves social media that is a broad format where a lot of consumers connect with each other through the internet and other things." Friedman Dep. at 80-16 to 81-5.  For Microsoft to suggest that this "massive social media campaign" does not include marketing via Facebook is disingenuous.

For theses reason the Court should find in Kinbook's favor as to this factor.

### h.  The Targets of the Parties' Sales Efforts Are the Same.

In its Memorandum of Law, Microsoft flatly contends that the parties do not target their sales efforts to the same consumers. *See* Memorandum of Law at 29-30. However, the evidence adduced through discovery, including through the deposition testimony of Microsoft's corporate designees, does not support this contention but demonstrates that Microsoft and Kinbook market to the same consumers.

Consumers of the Xbox platform are comprised not only of those consumers that purchased the devices themselves, but also the ultimate end users of such devices after they have been purchased and taken home.  It is these ultimate end users who may continue to make purchases and generate revenue for Microsoft through subscriptions to Xbox Live and through the purchase of content, games and other offerings through Xbox Live.  Friedman Dep. at 69-23 to 70-10; 70-11 to 71-13.

48

Microsoft targets retail consumers of virtually all ages by "offering an extraordinary new way to experience entertainment for me, my friends, and my family." Friedman Dep. at 85-23 to 86-4). In an internal Microsoft document titled "'Agra Naming Brief' that was prepared for purposes of setting guidelines for the selection of the name of the Kinect sensor (then known as Agra), Microsoft indicates that "[t]he primary target audience for the Agra-based experiences will be a more casual player. . . . There are women in these groups and all of them show a tendency to want to play in social situations, most often with friends and family." Gallucci Decl., Exhibit N at 3.

The Agra Naming Brief also provides that the naming should not focus on the core gaming segments of users but instead the focus should be on the following three new target segmentations all of which have a common theme of connecting with ones kin: (i) Hyper Social, (ii) Hanging Out, and (iii) Family Timer. Id. at 3. The "Hyper Social" segment is comprised of "teens and younger woman who crave acceptance and **social interaction**" and that desire to "stay **connected** with large groups of people." *Id.* at 5. The "Hanging Out" segment is comprised of teens and young adults "who are laid back and will go with the flow and join in what their **friends and family** want to do. . . . They tend to **play with family or one or two close friends** . . ." The "Family Timer" segment "[t]end to be parents who **prioritize family** above all else" and these folks "[f]eel that technology is getting too complicated and frustrating." *Id.* at 5 (emphasis added).

Identical to Microsoft, Kinbook markets its application to retail consumers desiring to stay connected to their friends and family members. Kinbox is an on-line social networking software application designed for the sharing of information such as online messages, photos and videos between and among family members. Toroian Dep. at 47-21

to 49-22.  As amply set forth in the original Web Development Worksheet, the concept

behind the application developed by Kinbook was to provide friends and family a secure

environment within which to share messages, photos, videos, and integrated calendars. *Id.*

The end goal or dream according to co-managing member Toroian was to see Kinbox

become just as large as Facebook in the realm of social networking as it pertains to friends

and families, a term that can be many things to many people. Toroian Dep. at 32-2 to 6.

In addition to the general target audience described above, both parties target the

vast number of active Facebook users.  Kinbox is a Facebook application.  Although

Microsoft alleges that "(o)n the other hand, Plaintiff targets customers that use Facebook"

and "there is no evidence that the parties market their products and services to the same

consumers", once again, discovery has revealed otherwise. As established above, Microsoft

also targets Facebook users by (i) advertising its Xbox platform on Facebook to Facebook

users, (ii) creating a "Facebook for Xbox" application to integrate Xbox Live and Facebook,

and (iii) entering into a partnership with Facebook and also making a sizable investment in

the company.   Gallucci Decl., Exhibits JJ and KK.

For all of these reasons, this factor weighs in Kinbook's favor.

### i.   The Goods Are Related In The Minds of Consumers Because Of The Similarity of Product Functions.

In contending that the parties' goods herein are unrelated because they do not have

similar functions, Microsoft relies almost exclusively on the *Checkpoint Systems* case. *See*

Microsoft Memorandum of Law at p.20.  However, a closer look at *Checkpoint Systems*

reveals that it is factually distinguishable from this matter with regard to the similarity of the

goods at issue. Moreover, Microsoft fails to point out that the *Checkpoint Systems* case,

which was not decided on summary judgment, found the "relatedness" analysis under this

50

*Lapp* factor to be "intensely factual", *Id.* at 287-288, thereby again underscoring the inappropriateness of summary judgment in a trademark action under the Lanham Act.

In *Checkpoint Systems*, the products at issue, though part of the same general category, were unrelated and operated in distinct niches within that category. Plaintiff Checkpoint Systems produced and sold electronic article surveillance systems, while the defendant, Check Point Software, produced and sold network security products. *Id.* at 277-278. Checkpoint Systems focused primarily on physical security, while Check Point Software focused on information and computer security. *Id.* at 286-287. At least in part because the Court found that the products at issue served different functions and contained only minimal overlap in product technology, the *Checkpoint* Court declined to find a likelihood of confusion. *Id.* at 288.

By contrast, the products at issue in this matter are similar and, hence, likely to be related in the minds of consumers. Both parties' respective platforms utilize similar hardware (*i.e.*, computer system and accessories), an Internet connection and Web-based applications in order for end users to enjoy the functionality offered by the parties' respective products. Gallucci Decl., Exhibit K. Moreover, the infringing mark "Kinect for Xbox" comprises much more than simply a "hardware gaming device" as indicated by Microsoft in its motion. Microsoft Memorandum of Law at 30. This point cannot be made more clear than by reading the following excerpt from Microsoft's 2011 Annual Report: "The Xbox 360 entertainment platform, including Kinect, is designed to provide a unique variety of entertainment choices for individuals and families through the use of our devices, peripherals, content and online services." Gallucci Decl., Exhibit Y.

In reality, the Kinect sensor is part of a platform-based offering marketed by Microsoft that includes the Xbox, Kinect for Xbox, the Xbox Live website, and other content. With the release of the Kinect for Xbox, Microsoft not only expanded its target user base but also expanded the functionality of the Xbox Platform in order to appeal to a larger audience. In fact, pursuant to an internal document prepared by or on behalf of Microsoft titled "Evolving the Xbox Brand," Microsoft and/or its third party branding consultant identified the functionality enabling one to "connect to friends and family when together or far apart" as a key factor in helping Microsoft evolve the Xbox brand from simply a gaming system for teen and adult males into a family entertainment center accessible to males and females of all ages. Gallucci Decl., Exhibit O.

Furthermore, Microsoft's CEO, Steve Ballmer, confirmed the importance of the Kinect for Xbox in an interview of him conducted by USA Today published on January 20, 2011 and titled "One on One: Ballmer Says Xbox, Kinect are Key Products." In that interview Mr. Ballmer made it clear that "Xbox isn't a gaming console. Xbox is a family entertainment center." He also highlighted the social networking functionality of the new Xbox Platform. Gallucci Decl., Exhibit R.

The core functionality that Microsoft has integrated into its Xbox Platform is clearly centered around the explosion of online social networking since the advent of websites such as Facebook, Twitter, You Tube and Skype, just to name a few.

Eli Friedman, Microsoft's Director of Global Marketing, acknowledged that one of the marketing points for the Xbox platform is to "[c]onnect to friends and family when together or far apart." Friedman Dep., at 63-8 to 64-10). This is further evidenced by the following functionality available to users of the Xbox Platform:

- instant messaging (Friedman Dep. at 20)

- video chat (Friedman Dep. at 38).

- sharing of content and playing games with other subscribers (Friedman Dep. at 20)

- online social networking through sites such as Facebook, Twitter and Video Kinect (Friedman Dep. at 36-10 to 37-15)

- uploading and sharing photographs and videos with select[5] friends and family (Friedman Dep. at 22-18 to 23-6).

Plaintiff's Kinbox application is also a Web-enabled social networking tool that was designed to help friends and family share information and stay connected in many of the same ways offered through the Xbox Platform. *See, e.g., A&H Sportswear*, 237 F.3d at 224-225 (relevant products do not need to be identical or even have the same focus, but merely "somewhat interchangeable").

As described below, users of the Kinbox application can currently perform most of the above-identified Xbox Platform functions and the remaining functionality was intended for future versions or releases of the Kinbox application:

- instant messaging is intended to be made available at a future phase when the product is made accessible via mobile phone devices. Toroian Decl., Exhibit C at 4.

- video chat is not currently available directly through the Kinbox application, however, users currently have the ability to upload videos to the application and then share the videos with selected users. Toroian Decl., Exhibit C at 2; *see also* Toroian Dep. at 100-4 to 7; Toroian Decl., Exhibit G at 8. The video chat functionality available with the Kinect for Xbox is similar to the chat functionality available to someone having a camera on a personal computer and using a Web-based service such as Skype. Friedman Dep. at 39.

---

[5] As set forth in the deposition testimony of Eli Friedman, the user is not required to share this information with all subscribers but instead can select the people with whom he or she desires to share such information. Friedman Dep. at 22-23.

53

- Kinbox was designed for the sharing of content such as online messages, photos and videos between and among family members.  Toroian Dep. at 47-21 to 49-22.

- online social networking is available through Facebook, the site on which Kinbox is currently residing.

- A Kinbox member is afforded the ability to upload pictures, videos and other content either from such users Facebook account or directly upload content to the Kinbox without the obligation of sharing such information with the overall Facebook profile.  Toroian Decl., Exhibit C at 2; *see also* Toroian Dep. at 100-4 to 7; Toroian Decl., Exhibit G at 8.

In its Memorandum of Law, Microsoft attempts to trivialize Kinbook's application by stating that it is "used only on Facebook" and then never mentions Microsoft's own affiliation with and support of Facebook.  Accordingly, Microsoft ignores several important facts in its motion.

First, although the Kinbox application is currently only available through Facebook[6], it was always intended that upon growth of its user base that it would eventually build a stand-alone application.   For this reason, the application was developed in such a way that the data such as the storage of photos and videos does not reside on storage provided by Facebook.  Rather, Kinbook pays for its own offsite storage of the data so that the application and its content could be moved off Facebook in the future and onto an independent website developed for Kinbox.  Toroian Dep. at 55-22 to 56-6.

Second, it was publicly announced in or around October 2007 that Microsoft invested $240 million in Facebook to become a shareholder in the company.  In a jointly released press statement dated October 24, 2007, the following statement was made describing the importance of the relationship:

---

[6] It should be noted that Facebook is a social networking Website which, per Facebook, has over 750 million active users that spend over 700 billion minutes per month on the site.

Making this investment and expanding this partnership will position Microsoft and Facebook to better take advantage of advertising opportunities around the world, and is a great win for not only for our two companies, but also our collective users and advertisers," said Kevin Johnson, president of the Platforms & Services Division at Microsoft. "We have partnered well over the past year and look forward to doing some exciting things together in the future. The opportunity to further collaborate as advertising partners is a big reason we have decided to take an equity stake, and is a strong statement of our confidence in the long-term economics of this partnership.   Gallucci Decl.,  Exhibit LL.

Third, after investing in Facebook, Microsoft not only began advertising on Facebook but also released "Facebook for Xbox" which "allows you to take part in some of the most popular activities on Facebook directly from your living room on your television. With Facebook for Xbox, you can update your status, browse updates from your friends and view photos on the big screen." Gallucci Decl., Exhibit MM.

Based on the facts presented, it is clear that both parties are heavily invested in social networking and are developing products with the same functionality in order to compete in this exploding market.  The fact that Kinbook decided to launch its application on Facebook (due to Facebook's sheer market-size in terms of number of users), all while Microsoft was heavily investing in, advertising on and integrating with Facebook, only strengthens Plaintiff's argument of likelihood of confusion since the result is that end users of each party's products are more likely to encounter the other party's products, thereby creating an assumption of "common source affiliation or sponsorship." *Checkpoint Systems*, 269 F.3d at 286.

This factor weighs in Plaintiff's favor.

## V.   CONCLUSION

For all the foregoing reasons, Plaintiff Kinbook, LLC respectfully requests that

Defendant's motion for summary judgment be denied in its entirety.


LAULETTA BIRNBAUM, LLC

BY: /s/  Richard D. Gallucci, Jr.
     RICHARD D. GALLUCCI, JR., ESQUIRE
     STEVEN H. DOTO, ESQUIRE

*Attorneys for Kinbook, LLC*

Dated:  September 6, 2011.

56