**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KINBOOK, LLC, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MICROSOFT CORPORATION, | : | |
| | : | NO. 10-4828 |
| Defendant. | : | |

**M E M O R A N D U M**

GENE E.K. PRATTER, J.                                        JANUARY 24, 2012

## I.    INTRODUCTION

Kinbook, LLC ("Kinbook"), a small online social networking software company, filed

this action against the Microsoft Corporation ("Microsoft") for unfair competition and reverse

trademark infringement under the Lanham Act of 1946, 15 U.S.C. § 1125(a).  Kinbook blames

Microsoft's release of "Kinect" (a controller-free motion sensor for its XBOX 360 video gaming

console) and "KIN" (a mobile smart telephone) for the largely unsuccessful start of its "Kinbox"

Facebook application.  Specifically, Kinbook claims that Microsoft's use of the word "Kin" in

conjunction with Microsoft's XBOX 360 logo (i.e., "Kinect for XBOX") is confusingly similar

to Kinbook's registered trademark "Kinbox."  Because of Microsoft's superior marketing power

and ability to saturate the market, Kinbook alleges Microsoft usurped its business identity and the

value of its trademarks.  As a result, Microsoft detrimentally affected the fortunes of Kinbook's

business.

1

Microsoft filed the instant motion for summary judgment (Doc. No. 28), asserting that there is no likelihood of confusion between the marks of Kinbook and Microsoft.  For the reasons set forth below, the Court grants Microsoft's motion for summary judgment.

## II.   FACTUAL BACKGROUND

### A.   Microsoft's Kinect for XBOX 360 and KIN Phone

Microsoft is a software and consumer technology company that has been in existence since 1975.  MS Facts ¶ 1.  Microsoft's most popular video game hardware device is its "XBOX 360" gaming console, the successor to its original "XBOX" console introduced in November 2001.  As of June 2011, Microsoft has sold over fifty-five (55) million units of its XBOX 360 console.  Id. at 2.

The XBOX 360 brand is much more than just the XBOX 360 console.  Under the XBOX 360 umbrella, Microsoft markets the XBOX 360 console, XBOX Live,[1] and a variety of video games.  Kinbook Facts ¶ 25.  In June 2009, Microsoft announced it planned to add a new product to the XBOX 360 brand: an interactive controller-free gaming device named "Kinect."[2]  MS Facts ¶ 3.  Kinect is a hardware sensor that a user can attach to an XBOX 360 console enabling operation and interfacing with the XBOX 360 using gestures and spoken commands without the aid of a controller.  Id. at 4.  It is compatible only with the XBOX 360 console and other XBOX 360 products.  Microsoft asserts that it named the gaming sensor "Kinect" because of its kinetic

---

[1] XBOX Live is the online subscription service for XBOX 360 that enables users to share content, play video games with other XBOX Live subscribers, and enjoy a wide array of entertainment options on their televisions by way of their XBOX 360 console.

[2] Microsoft did not publically reveal the name "Kinect" for its soon-to-be-released gaming sensor until June 2010. In the interim, Microsoft ran a trademark search in October 2009, and on April 26, 2010 filed its application for trademark registration with the United States Patent and Trademark Office for its "Kinect" product.  Kinbook Facts ¶ 46.  Previously, on October 29, 2009, Microsoft filed its first trademark registration for the Kinect mark in South Africa.  See MS Reply at 16.

qualities.  Id. at 5.  However, various internal Microsoft documents note that the name carries

connotations of staying connected with friends and family.  Kinbook Facts ¶¶ 33-39.

In November 2010, Microsoft released the Kinect gaming sensor to the public to great

fanfare, and within its first sixty (60) days on the market, Microsoft sold over eight (8) million

Kinect units.  MS Facts ¶ 7.  The Kinect gaming sensor retails for approximately $150 by itself,

and between $300 and $500 when bundled with the XBOX 360 console.  Id.  Consumers may

purchase Kinect directly from Microsoft or at most electronics retailers, such as Best Buy or

Amazon.  Id. at 8.

Microsoft targets its sales of Kinect to consumers who already own an XBOX 360

console or who would be interested in purchasing an XBOX 360 console.  Id.  But, in public

statements and internal documents, Microsoft personnel have expressed the hope that the Kinect

sensor would broaden the appeal of XBOX 360, and transform it from merely a gaming console

to a "family entertainment center."  Kinbook Facts ¶ 23.  Kinect is marketed almost exclusively

with the well-known XBOX 360 mark, which is prominently displayed on the Kinect gaming

sensor itself, on all packaging for the Kinect, and in all advertisements and marketing materials

for the Kinect.  MS Facts ¶ 6.   As of September 2011, Microsoft had spent over $100 million on

promotion, advertising, and marketing of Kinect.  Id. at 8.

While Microsoft's Kinect product has been met with rave reviews, not all of its products

have been unbridled successes.  In April 2010, Microsoft developed and launched a new line of

mobile smart phones exclusively for the Verizon Wireless mobile phone service known as the

"KIN ONE" and the "KIN TWO" (collectively, "KIN").  Id. at 9.  Microsoft chose the name KIN

because it related to the concept of "next of kin" and those around the user with whom the user

associates.  Kinbook Facts ¶ 40.  The KIN phones retailed for $199 or less, and required the purchase of a Verizon Wireless service plan.  MS Facts ¶ 10.  KIN phones did not connect with the public.  Two months after the KIN phone's debut, Microsoft announced that it would cease production of the KIN phones due to a lackluster demand for the product.  Id. at 11.

Other than the KIN phone and the Kinect gaming sensor's common use of the term "kin" in their names, they are in all other relevant respects completely different products.  Id. at 12.  Indeed, the products are made by two separate divisions of Microsoft.  Moreover, Microsoft has no intention of using the KIN mark on any future products.  Id. at 13.

### B.        Kinbook, LLC's "Kinbox" and "Munchkinbox"

Kinbook is a small company founded by Ms. Cassandra Toroian and Ms. Jacqueline Blue.  Kinbook Facts ¶ 2; MS Facts ¶ 18.  The mission of the company is to "provide a digital world for family memories and communications, for current and future generations so they won't forget."  Kinbook Facts ¶ 5.  Consistent with that mission, in May 2009, Ms. Toroian and Ms. Blue began development of a software application designed for the sharing of online messages, photos, and videos between and among friends and family members.  Id. at 2.

Although Ms. Toroian and Ms. Blue initially sought to develop their own web site to serve as the platform for the Kinbook service, in July 2009, in an effort to conserve costs and attract a user base, they decided to launch the service as an application available on the social-networking web site, Facebook.[3]  Id. at 3, 4.  The Facebook application Kinbook developed is unique in that it allows people that are members of Facebook to form their own personal social

---

[3] Facebook is a social networking service and web site where users can create a personal profile, add other users as friends, and exchange messages, photos, or videos.  A "Facebook application" is a software application designed to enhance users' experience on Facebook by allowing them to interact with online friends in various ways.  See MS Facts ¶ 16.

networks and not "let everyone that they are friends with on Facebook in." Id. at 7. In other words, it allows users to create private sub-social networks for sharing information within Facebook. In addition, all data that users upload to the application does not reside on storage provided by Facebook, but rather is stored on Kinbook's own offsite storage to enable a later seamless transition to an independent web site. Id.

After consulting with counsel on the trademark application process, Ms. Toroian and Ms. Blue learned that over the past several years, Facebook, Inc. had opposed or threatened to oppose all trademark applications with a "____Book" mark for companies intending to launch applications for the Facebook service. Id. at 5. After confirming this fact with Facebook, Inc., Ms. Toroian and Ms. Blue decided to change the name of its Facebook application from "Kinbook" to "Kinbox" and "Munchkinbox."[4] Id. After conducting a trademark search in September 2009, Ms. Toroian and Ms. Blue sought registration of the marks "Kinbox" and "Munchkinbox" with the United States Patent and Trademark Office, and formally launched its application on Facebook in December 2009. Id. at 5, 13, 14. In September 2010, the Patent and Trademark Office accepted the Statement of Use for the Kinbox and Munchkinbox marks. Id. at 15.

In spite of their decision to launch a Facebook application instead of a web site, Ms. Toroian and Ms. Blue did not abandon their plans to launch an independent web site. Indeed, Kinbook purchased the web domain names, Kinboxx.com and Kinbox.org. Id. at 10. In addition to their intention to launch the service as a stand-alone web site, Ms. Toroian and Ms. Blue assert that they also intended to develop a mobile phone application at a later date. Id. at 3-4, 10.

---

[4] "Munchkinbox" was intended to be a counterpart on-line social networking service to Kinbox for use among children and their extended family. MS Facts ¶ 6.

Kinbook does not charge users a fee to use Kinbox.  Instead, Kinbook's plan to remain

financially solvent is to generate revenue from advertising, selling content (i.e., photo books,

calendars), and selling additional storage to users.  Id. at 11.

### C.    Kinect for XBOX 360's Effect on the Kinbox

Despite Ms. Toroian's and Ms. Blue's inspiring aspirations, Kinbook has been largely

unsuccessful to date and has been unable to generate any revenues from Kinbox.  Id. at 11.

Likewise, Kinbook markets Kinbox and Munchkinbox exclusively on the Facebook platform,

and, although Ms. Toroian testified that she and Ms. Blue originally intended to spend a

minimum of $250,000 marketing Kinbox, to date they have only spent a few thousand dollars on

advertising and marketing.  Id. at 16; MS Facts ¶¶ 15, 19.  As of May 2011, Kinbox had only

16,685 active monthly users out of over 750 million regular Facebook users.[5]  Kinbook Facts ¶

11.

Kinbook credits the arrival of the Kinect for XBOX 360 and Microsoft's accompanying

marketing blitz with the poor start of its "Kinbox" Facebook application.[6]  Kinbook claims that

Microsoft's use of the word "Kin" in conjunction with Microsoft's XBOX logo (i.e., "Kinect for

XBOX") is confusingly similar to its registered trademark "Kinbox."[7]  According to Ms.

Toroian, Microsoft's "Kinect for XBOX" mark along with its overwhelming marketing dollars

rendered Kinbook's first-in-time registration of its Kinbox and Munchkinbox marks useless, and

effectively pushed them out of the market.

---

[5] Microsoft contends that Kinbox had only 14 active users as of May 2011.  MS Facts ¶ 18.  As of September 2011, Kinbook asserts that Kinbox has 16,752 monthly active users.  Kinbook Facts ¶ 11.

[6] Ms. Toroian testified that "a company the size of Microsoft could afford to spend hundreds of millions of dollars in a marketing campaign so that it would envelop anything that [Kinbook] was trying to do."  Kinbook Facts ¶ 17.

[7] Microsoft maintains, and the record reflects, that it does not market its Kinect product as "Kinect for XBOX." Instead, it either markets its product as "Kinect" or "Kinect for XBOX 360."

Accordingly, on September 17, 2010, Kinbook filed a Complaint against Microsoft alleging one count of unfair competition and trade dress infringement[8] in violation of the Lanham Act.  15 U.S.C. § 1125(a).  Kinbook alleges that it incurred significant expense developing its "Kinbox" and "Munchkinbox" Facebook applications and that Microsoft has infringed the trademark and tradename rights of Kinbook by creating and marketing its Kinect and KIN products.  Microsoft has filed a motion for summary judgment, which is now pending before the Court.

### III.    LEGAL STANDARD

Upon motion of a party, summary judgment is appropriate if, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  FED. R. CIV. P. 56(c); Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution could affect the result of the suit under governing law.  Id.

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no

---

[8] Kinbook's claim, in reality, sounds in reverse trademark infringement and unfair competition.

genuine issue of material fact, summary judgment is appropriate.  <u>Celotex Corp. v. Catrett</u>, 477

U.S. 217, 322 (1986); <u>Wisniewski v. Johns-Manville Corp.</u>, 812 F.2d 81, 83 (3d Cir. 1987).

      The party opposing summary judgment must support each essential element of that

party's opposition by "citing to particular parts of materials in the record."  Fed. R. Civ. P.

56(c)(1).  "The Court need consider only the cited materials" when determining whether there

exists a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(3).  If the cited evidence is

"merely colorable, or is not significantly probative, summary judgment may be granted."

<u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying

purpose of summary judgment [which] is to avoid a pointless trial in cases where it is

unnecessary and would only cause delay and expense."  <u>Walden v. Saint Gobain Corp.</u>, 323 F.

Supp. 2d 637, 641 (E.D. Pa. 2004) (citing <u>Goodman v. Mead Johnson & Co.</u>, 534 F.2d 566, 573

(3d Cir. 1976)).

## IV.    DISCUSSION

      Kinbook alleges that Microsoft's use of the marks "Kinect" and "KIN" infringes on its

registered trademark and constitute unfair competition under the Lanham Act.  The elements for

trademark infringement and unfair competition under the Lanham Act are the same.  <u>A & H</u>

<u>Sportswear, Inc. v. Victoria's Secret Stores, Inc.</u>, 237 F.3d 198, 210 (3d Cir. 2000).  To prevail

on either claim, Kinbook must demonstrate that (1) it owns the "Kinbox" mark, (2) the mark is

valid and legally protectable, and (3) Microsoft's use of its Kinect and/or KIN marks to identify

its goods is likely to cause confusion with Kinbook's Kinbox mark.  <u>Id.</u>; <u>Commerce Nat'l Ins.</u>

<u>Servs., Inc. v. Commerce Ins. Agency, Inc.</u>, 214 F.3d 432, 437 (3d Cir. 2000).  Microsoft argues

that Kinbook is unable as a matter of law to establish the second and third of these elements.

Because the Court concludes that based on the record evidence a reasonable jury could not find

that a likelihood of confusion exists between the parties' marks, the Court will analyze only that

aspect of Microsoft's motion.[9]

A defendant's use of a mark is likely to cause confusion where "an appreciable number

of ordinarily prudent consumers" seeing the mark, Everett Labs., Inc. v. Vertical Pharm., Inc.,

227 F. App'x 124, 127 (3d Cir. 2007) (emphasis removed), "would probably assume that the

product or service it represents is associated with the source of a different product or service

identified by a similar mark." Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852, 862 (3d Cir.

1992) (quotation marks omitted). In Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983),

the Third Circuit Court of Appeals developed a non-exhaustive list of factors to consider when

determining whether there is a likelihood of confusion between two or more marks. These "Lapp

factors" include:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
>
> (2) the strength of the owner's mark;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
>
> (5) the intent of the defendant in adopting the mark;

---

[9] Because the Court finds that there is no likelihood of confusion between the parties' marks, it will decline to reach a conclusion as to whether Kinbook's marks are valid and legally protectable.  However, even if Kinbook's marks are, in fact, legally protectable, Microsoft is entitled to judgment as a matter of law because no reasonable jury could conclude, based on the evidence before the Court, that there is a likelihood of confusion between the parties' marks. While the Court acknowledges that "[f]ailure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception," Doebler's Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 (3d Cir. 2006), Kinbook fails to offer any evidence demonstrating that a genuine issue of material fact exists for a jury as to likelihood of confusion.

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

Id. at 463.  "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other."  Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 182-83 (3d Cir. 2010).

There are two types of "likelihood of confusion" claims: "direct confusion" claims and "reverse confusion" claims.  Reverse confusion – the type of likelihood of confusion claim applicable to this action[10] – "occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services."  Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 474 (3d Cir. 1994).  Therefore, "the 'junior' user is junior in time but senior in market dominance or size."  Freedom Card, Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 471 (3d Cir. 2005).

---

[10] Microsoft argues at length in its reply brief that Kinbook alleges reverse confusion for the first time in its opposition brief to Microsoft's motion for summary judgment, and failed to allege reverse confusion in its Complaint.  However, Kinbook is correct that "'reverse confusion' is not a new claim, but rather an alternative theory of liability for infringement under the Lanham Act."  Birmingham v. Mizuno USA, Inc., No. 09-566, 2011 WL 1299356, at *17, n.20 (N.D.N.Y. Mar. 31, 2011); see also Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291, 296 (S.D.N.Y. 2001) (noting that "allegations of forward confusion and reverse confusion do not form distinct claims-they are alternative theories that can be used separately or together in a trademark infringement claim under the Lanham Act"); cf. Bechtel v. Robinson, 886 F.2d 644, 649, n.9 (3d Cir. 1989) ("Under the federal rules, as long as the issue is pled, a party does not have to state the exact theory of relief in order to obtain a remedy.").  Regardless, demonstrating laudable acuity and acumen, Microsoft anticipated and briefed reverse confusion both in its opening and reply briefs in support of its motion for summary judgment.

"Economic reality and common sense" dictate that certain of the <u>Lapp</u> factors (particularly the second, fifth, and sixth factors) must be analyzed differently than in a typical direct confusion case.  <u>Id</u>. at 472.

In its motion for summary judgment, Microsoft urges the Court to dismiss Kinbook's trademark infringement claims as a matter of law because there is no likelihood of confusion between the parties' marks.  For the reasons that follow, the Court agrees that there is no likelihood of confusion between the parties' marks, and therefore grants Microsoft's motion for summary judgment.

### A.      Similarity of the Marks (<u>Lapp</u> Factor No. 1)

The single most important factor in determining likelihood of confusion is mark similarity.  <u>See</u> <u>Fisons</u>, 30 F.3d at 476.  The test for such similarity is "whether the labels create the same overall impression when viewed separately."  <u>Id</u>. at 477 (citation omitted).  Marks "are confusingly similar if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship."  <u>Id</u>.  Side-by-side comparison of the two marks is improper where the products are not normally displayed together in the market to consumers.  <u>A & H Sportswear</u>, 237 F.3d at 216.  Courts must "compare the appearance, sound, and meaning of the marks."  <u>Checkpoint Sys., Inc. v. Check Point Software Techs. Inc.</u>, 269 F.3d 270, 281 (3d Cir. 2001).

Microsoft argues that on the face of the parties' marks, it is clear that the marks are both visually and phonetically different.  To be sure, the fonts and colors used in each mark are wholly

distinct, and the marks create entirely different overall impressions when viewed separately.  <u>See</u> MS Facts ¶¶ 12, 14.

The Kinbox mark is written in an orange bubble-like font with a thin royal blue outline. Behind the small orange "i" in the word "kin" is a larger royal blue "i" that creates the impression of a parent standing behind a child.  The "o" in the word "box" is a rectangle that contains what resembles a blue person that occupies two thirds of the box waving to an orange person in the distance who occupies the remaining third of the box.



The Munchkinbox mark is depicted in much the same way as the Kinbox mark.  The lower case "i" in the word "Munchkin" is identical to the lower case "i" in the "Kinbox" mark. Likewise, the word "box" is written precisely as it is in the Kinbox mark: orange with a royal blue outline, with the same box logo substituted for the lower-case "o."  The primary difference between the "Kinbox" and "Munchkinbox" marks is that the word "Munchkin" is written in royal blue with a thin orange outline.



The Kinect mark, on the other hand, is written in a fairly plain font in all capital letters. The word "Kinect" contains no special graphics or design elements of note.

# KINECT

However, the word Kinect is almost always prominently accompanied by the famous XBOX 360 mark.  The XBOX 360 mark is generally depicted in a lime green and silver color scheme, and frequently is preceded by a silver sphere with a lime green "x" through the upper portion of it.



The KIN phone mark is also completely different from the Kinbox mark.  The KIN phone's mark is written in a vertically elongated black font.  The "K" in "KIN" is written so that each diagonal line is squared off into a right angle.  The resulting effect is that the "K" resembles an upper-case "H" with two horizontal lines, and a gap on the right side of the "H" between the two horizontal lines.



Thus, the visual appearances of the these marks are wholly distinct, and the ordinary consumer could not reasonably conclude that the Kinect gaming sensor or the KIN phone are in any way related to the Kinbox Facebook application.

The only common element between the "Munchkinbox" and "Kinbox" marks, and the "KIN" and "Kinect" marks is the term, word, or letters, "kin."  However, the use of a similar term in two marks does not give rise to the conclusion that the marks are so similar that they are likely to confuse.  See, e.g., Everett Labs, 227 F. App'x at *4-5 (finding on a motion for preliminary injunction no likelihood of confusion between pharmaceutical company's product

13

"Strovite" with competitor's "Corvite" for prescription vitamin).  As Microsoft explained at

length in its motion papers, numerous third-parties' trademarks contain the term "kin" for a

variety of services and products, including multiple social networking web sites and services.[11]

MS Facts ¶ 21, MS Ex. G.  Ms. Toroian admitted at her deposition that she does not find these

other uses of the term "kin" to be confusingly similar.  MS Facts ¶ 22.  The Court does not see

how Microsoft's uses of the term "kin" in its marks for its gaming sensor and phone could be any

more closely related to Kinbox or more confusing than these other examples that are referenced

in footnote 11.

Although Kinbook asserts that Microsoft's use of "kin" and "box" together in what it

describes as Microsoft's "Kinect for XBOX" mark is the source of the purported infringement,

the Court is not persuaded.  First, Microsoft's mark is not "Kinect for XBOX"; it is simply,

"Kinect."  Second, even assuming Microsoft's mark was "Kinect for XBOX," a reasonable jury

would not find that "Kinect for XBOX" looks, sounds, or means the same as the mark "Kinbox."

After all, the mark "XBOX" is certainly arbitrary and carries with it significant and pre-existing

brand recognition.  The word "box" is not so easily spliced from the term "XBOX."  Regardless,

Microsoft's use of "360" with the term "XBOX" makes Microsoft's mark even more distinctive.

Third, considering that the Kinect gaming sensor is always marketed and affixed with

Microsoft's "XBOX 360" mark, the likelihood of confusion with Kinbook's marks is

---

[11] These include, but are not limited to, "Kincafe," an online social network for families to connect; "Kin Valley," a secure online social network for the family; "Kinzin," an online social publishing service to allow groups to privately share photos; "Kinnect.Us," an online social networking service to stay connected with family and friends; "Kinector," an online service to help users stay connected with relatives through a private web site where family can share information; "Connect 2 Kin," an online service for families to stay in touch and share photos, share documents, schedule events, etc.; "Kindle," an e-book reader with social networking capabilities; and many others. MS Facts ¶ 21.  The list is long enough to call to mind Shakespeare's observation, "One touch of nature makes the whole world kin."  William Shakespeare, Troilus and Cressida, act 3, sc. 3 (1602).

substantially and further diminished.  See A & H Sportswear, 237 F.3d at 218 ("[A]ffixing a

well-known housemark . . . can help diminish the likelihood of confusion.").[12]

Accordingly, because Kinbook failed to put forth sufficient evidence for a reasonable jury

to find that the marks are confusingly similar when viewed separately, the first Lapp factor

weighs against a finding of likelihood of confusion and in favor of Microsoft.

### B.       Strength of the Owner's Mark (Lapp Factor No. 2)

The term "strength" in the context of trademarks refers to the distinctiveness of the mark;

"its tendency to identify the goods sold under the mark as emanating from a particular, although

possibly anonymous, source."  Ritz Hotel, Ltd. v. Shen. Mfg. Co., Inc., No. 05-4730, 2009 WL

1838357, at *4 (E.D. Pa. June 25, 2009).  In evaluating the strength of a mark under Lapp, courts

look to (1) the inherent features of the mark contributing to its distinctiveness or "conceptual

strength" and (2) the factual evidence of the mark's marketplace recognition or "commercial

strength."  Freedom Card, 432 F.3d at 472.

### 1.  Conceptual strength

The inquiry into conceptual strength is the same regardless of whether the plaintiff alleges

direct or reverse confusion.  A & H Sportswear, 237 F.3d at 231 ("When it comes to conceptual

strength . . . we believe that, just as in direct confusion cases, a strong mark should weigh in

---

[12] At oral argument, counsel for Kinbook represented that Microsoft's motion for summary judgment is premature because Kinbook has not yet completed discovery.  Specifically, counsel noted that Kinbook has not yet received e-mails between Microsoft's Rule 30(b)(6) witness, Eli Friedman, and two consulting firms Lexicon and Interbrand, related to the naming of Kinect.  Although the Court recognizes that the parties' dispute whether the Kinect gaming sensor was named for its "Kinetic" motion-related qualities, or for its function of aiding users in "connecting" with "kin" or family, considering the overwhelming evidence in favor of Microsoft, this one disputed fact is not ultimately material to whether the parties' marks are confusingly similar, and additional discovery related to this issue will not materially affect the Court's determination that a reasonable jury could not conclude that the marks are confusingly similar.

favor of a senior user.").  The conceptual strength of a mark is measured by classifying the mark

from strongest to weakest as either (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, or (4)

generic.  Sabinsa, 609 F.3d at 185 (citations omitted).

Arbitrary or fanciful marks use "terms that neither describe nor suggest anything about

the product " [e.g., Kodak].  Id.  Suggestive marks require consumer "imagination, thought, or

perception" to determine what the product is [e.g., Coppertone].  Id.  As the Court of Appeals

explained in A.J. Canfield, terms that are arbitrary or suggestive are generally treated as

distinctive and, therefore, legally protectable.  A.J. Canfield Co. v. Honickman, 808 F.2d 291,

297 (3d Cir. 1986).

Descriptive marks "forthwith convey[ ] an immediate idea of the ingredients, qualities or

characteristics of the goods" [e.g., Security Center].  Sabinsa, 609 F.3d at 185.  If a mark is

merely descriptive, a claimant can still establish that its mark is legally protectable if the claimant

can prove that the mark has achieved secondary meaning in the mind of the consuming public.

Checkpoint Sys., Inc. v. Check Point Software Techs. Inc., 104 F. Supp. 2d 437, 459 (D.N.J.

2000), aff'd, 269 F.3d 270 (3d Cir. 2001).

Finally, generic marks "function as the common descriptive name of a product class"

[e.g., Diet Chocolate Fudge Soda].  Id. (internal citations omitted); see also A.J. Canfield, 808

F.2d at 296.  A mark that is characterized as generic is never protectable because "even complete

success . . . in securing public identification . . . cannot deprive competing manufacturers of the

product of the right to call an article by its name."  Id. at 297 (citation omitted) (quotation

omitted).

Microsoft argues that Kinbook's marks are merely descriptive without secondary

meaning, but even if categorized as suggestive, constitute weak marks.  Microsoft observes that

both Kinbook marks describe a characteristic of Plaintiff's online social-networking services and

consist of two words combined – "Kin" ("one's relatives") or "Munchkin" ("children") and

"box" ("to enclose in or as if in a box, or something with four sides that holds things inside of

it") – that describe the precise function of its products.  MS Opening Brief at 15.  Therefore, it

argues, the terms used in the mark are descriptive of the product and not entitled to protection.

However, even if the Court were to find that the marks are suggestive, the great number of online

social networking services that incorporate the term "kin" into their marks renders Kinbook's

marks weak regardless of their categorization.

Kinbook, on the other hand, maintains that Kinbox and Munchkinbox are strong marks

that should be categorized as suggestive.  It argues that applying the imagination test, the marks

"Kinbox" and "Munchkinbox" require imagination, thought or perception to reach the conclusion

that the nature of the goods they represent constitute "online multi-functional Facebook

application[s] . . . that allows friends and family members to interact with one another," and

share various files with one another.

Although the Court declines to classify Kinbook's marks definitively, even if the Court

were to assume that the Kinbox and Munchkinbox marks are suggestive as Kinbook contends,

the Court cannot conclude based on the record evidence that Kinbook's marks are conceptually

strong.  Though a "useful guide in assessing strength or weakness of a mark," a mark's

classification is not dispositive of its conceptual strength or in whose favor the second Lapp

factor should be weighted.  A & H Sportswear, 237 F.3d at 222 (citing Express Servs., Inc. v.

Careers Exp. Staffing Servs., 176 F.3d 183, 186 (3d Cir. 1999)).  "Suggestive or arbitrary marks

may, in fact, be 'weak' marks, particularly if they are used in connection with a number of

different products."  A & H Sportswear, 237 F.3d at 222; see also Citizens In. Grp. v. Citizens

Nat'l Bank of Evans City, 383 F.3d 110, 123 (3d Cir. 2004) ("[A]s a general rule, widespread use

of even a distinctive mark may weaken the mark."); One Indus., LLC v. Jim O'Neal Distrib.,

Inc., 578 F.3d 1154, 1164 (9th Cir. 2009) ("In a crowded field of similar marks, each member of

the crowd is relatively weak in its ability to prevent use by others in the crowd.") (citation

omitted).

    Standing alone, the term "kin" is seemingly a descriptive term in this context, and at best,

a highly suggestive term.  See J. Thomas McCarthy, McCarthy on Trademarks and Unfair

Competition § 23:48 (4th ed. 2001) ("If the common element of conflicting marks is a word that

is 'weak' then this reduces the likelihood of confusion.  A portion of a mark may be 'weak' in

the sense that such portion is descriptive, highly suggestive, or is in common use by many other

sellers in the market.").  Here, as has been recounted at length, Microsoft has presented ample

undisputed evidence demonstrating the widespread use of the term "kin" in the marks of a litany

of products and services that occupy the "social networking for families and friends" market.

See MS Ex. G.  Indeed, a great many of these similar "kin" related marks in the online social

networking sphere are senior to Kinbook's marks, further weakening the extent of Kinbook's

protection.  Coupled with the term "box," it is arguable that the Kinbox mark is suggestive.

However, even assuming that the "Kinbox" mark is suggestive, the prevalence of marks with the

prominent term "kin" in the online social networking service sphere renders the  "Kinbox" mark

weak in this context.

### 2.   Commercial strength

In a reverse confusion case, "the lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion."  A & H Sportswear, 237 F.3d at 231 (citation omitted). Nonetheless, "analysis of the strength of the senior user's mark is relevant" in a reverse confusion case.  Freedom Card, 432 F.3d at 477.

Kinbook has failed to provide any evidence that its Kinbox and Munchkinbox marks have any sort of marketplace recognition.  Kinbook admits that its mark is not well-known by consumers.  Indeed, Kinbox has, at most, only 16,752 active monthly users out of over 750 million regular Facebook users.  Kinbook Facts ¶ 11.  Additionally, Kinbook acknowledges that it has not dedicated any significant time, money, or effort to advertise, promote, or market its marks or services.  In fact, Kinbook admits that it affirmatively scaled down its advertising and marketing activities from aspirations of $250,000 to just a few thousand dollars following Microsoft's release of Kinect.  Id. at 16, 17.

In Freedom Card, the Third Circuit agreed with the district court that because the plaintiff's mark was conceptually weak and it failed to produce any evidence of the commercial strength of its mark, the second Lapp factor weighed in favor of the defendants.  Freedom Card, 432 F.3d at 477; Richards v. Cable News Network, Inc., 15 F. Supp. 2d 683, 691 (E.D. Pa. 1998).  The same is true for the parties here.  Accordingly, because no reasonable jury could conclude based on the record evidence that Kinbook's marks are strong, the second Lapp factor weighs against a finding of likelihood of confusion and in favor of Microsoft.

C.      **The Price of the Goods and Sophistication of Consumers (<u>Lapp</u> Factor No. 3)**

"Different price points make confusion less likely, because the parties' goods will be purchased by different classes of consumers."  <u>Ritz Hotel</u>, 2009 WL 1838357, at *6.  When a product is relatively expensive, "more care is taken and buyers are less likely to be confused as to source or affiliation."  <u>See</u> <u>Checkpoint</u>, 269 F.3d at 284.  Where consumers are known to exercise a higher degree of care in evaluating products prior to making purchasing decisions, courts have been prone to find that there is not a strong likelihood of confusion.  <u>Id</u>.

The Kinect gaming sensor costs $150, or $300-$500 when bundled with an XBOX 360 console.  MS Facts ¶ 7.  At that price point, the Kinect gaming sensor is sufficiently expensive so as not to constitute an impulse-purchase for the vast majority of its customers.  Likewise, the KIN mobile phones were priced at approximately $199 when they were available, and consumers were required to sign up for a Verizon Wireless service plan along with it that locked the customer into a multi-month commitment and costed hundreds of additional dollars per year.  MS Facts ¶ 10.  Consumers exercise a great degree of care when purchasing both a phone and a wireless service plan.  Kinbox and Munchkinbox, on the other hand, are free services for their users that only require a Facebook account to use.  These patently different price points suggest that a likelihood of confusion is remote at best.

Kinbook responds that other XBOX 360 items – subscriptions, content, and games – can be purchased for much less than Kinect or the XBOX 360 gaming console.  Although that may be accurate, Kinbook's focus on the XBOX 360 platform as a whole is misplaced.  The product at issue is "Kinect," not every product associated with the XBOX 360 platform.  Nevertheless, even the XBOX 360 products "that have a much lower cost . . . typically under $60," still attract

a vastly different class of consumers than those who are using the free Kinbox application.
Kinbook Response at 41.

Kinbook's argument regarding the least sophisticated consumer is equally without merit.
Kinbook cites to Ford Mtr. Co. v. Summit Mtr. Prods., 930 F.2d 277, 293 (3d Cir. 1991) for the
proposition that "[w]hen the buyer class is mixed, the standard of care to be exercised by the
reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the
class."  Microsoft's corporate designee, Eli Friedman testified that the "target" age range for
Kinect for XBOX 360 users is 5 to 80 years of age.  See Kinbook Ex. H, Friedman Dep. 68:5-
68:14.  Accordingly, Kinbook argues, because the least sophisticated user of XBOX 360
products, content, and services is a mere 5 years of age, the least sophisticated consumer is a 5
year-old, who Kinbook claims could easily confuse Kinect with Kinbox.  See Kin Response at
41.  First, it would be completely unreasonable to assign a 5 year-old as "the reasonably prudent
purchaser" for the purposes of this analysis.  No matter what else the ever-remarkable current-
day precocious 5 year-old can accomplish, this Court cannot fathom a 5 year-old with either the
faculties or the financial means to independently purchase a retail item costing hundreds of
dollars.  Second, even the hypothetical precocious 5 year-old dispatched by indulgent parents (or
grandparents) to make her or his own selections of amusement would likely be able to distinguish
between a free software application, and a $150 piece of gaming hardware.  Third, the only
people that would actually purchase a Kinect are well aware of the XBOX 360, and would only
buy a Kinect if they already had or planned to purchase an XBOX 360 console.[13]

---

[13]  Of course, these observations do not include any assumptions as to the facility of a young 21st century child to *use*
these electronic items or a comparison of the ease of use by a 5 year-old as compared to the other outer-edge of the
"target" group, i.e., someone in his or her 80's.

Accordingly, the Court concludes as a matter of law that based on the record evidence no reasonable jury could find that this <u>Lapp</u> factor weighs in favor of finding a likelihood of confusion.

### D.      Actual Confusion (<u>Lapp</u> Factors Nos. 4 and 6)

"Evidence of actual confusion is not required to prove likelihood of confusion." <u>Checkpoint</u>, 269 F.3d at 291.  Although evidence of actual confusion is not essential, such evidence would certainly strengthen a plaintiff's case.  <u>Fisons</u>, 30 F.3d at 476.  "If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future.  The longer the challenged product has been in use, the stronger this inference will be."  <u>Versa Prods., Co. v. Bifold Co. (Mfg.) Ltd.</u>, 50 F.3d 189, 205 (3d Cir. 1995).

Here, neither the Kinect gaming sensor, the KIN phone, nor the Kinbox application have been sold for a particularly long period of time.  However, in that limited period of time, Kinbook asserts that there have been four instances of actual confusion: (1) a third-party web site, www.socialbakers.com identified Kinbox as a "related application" to Kinect for XBOX 360, Kinbook Ex. EE; (2) another third-party web site www.overclock.net, contained a blog post noting the potential for integrating the names for Kinect and XBOX 360 into "Kinbox," Kinbook Ex. FF, (3) www.kinboards.com contained a user comment on a message board that "Kinect is the bridge between Kin and XBOX 360," Kinbook Ex. GG; and (4) an online PC Magazine article described the cylindrical box that the KIN phone was packaged in as a "Kin box." Kinbook Ex. HH.

Of these four purported instances of confusion, only the first web site actually identified the Kinbox product.  See Kinbook Ex. EE.  However, the purported confusion on this web site posting does not relate in any way to "mistaken purchasing decisions."  First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc., 923 F. Supp. 693, 705 (E.D. Pa. 1996) ("Generalized confusion is not what courts look to, but rather, evidence of confusion in mistaken purchasing decisions."); see also Citizens Nat'l Bank of Meridian v. Citizens Bank of Philadelphia Miss., 35 F. App'x 391, 391 (5th Cir. 2002).  The second two examples of purported confusion merely surmise that the general name "Kinbox" could become an abbreviation for "Kinect for XBOX 360."  Kinbook Exs. FF, GG.  Aside from being highly speculative, these examples relate only to confusion about the name or function of Microsoft products, and in no way relate to actual confusion by consumers of Microsoft products with Kinbook products.  Finally, the PC Magazine article did not mention the Kinbox product, but merely referred, in the most literal sense, to the packaging of the KIN phone as a "KIN Box."  Kinbook Ex. HH.

Kinbook has not presented any evidence of actual confusion.  Accordingly, the Court finds that this Lapp factor merits little, if any, weight in the likelihood of confusion inquiry.

### E.    Intent of the Defendant in Adopting the Mark (Lapp Factor No. 5)

Intent to confuse is relevant both in direct and reverse confusion cases.  A & H Sportswear, 237 F.3d at 232.  "The difference is that the tenor of the intent to confuse evidence changes from the deliberate intent to palm off or exploit the goodwill of the senior user's mark (deliberate confusion), to the deliberate intent to push the senior user out of the market (reverse confusion)."  Freedom Card, 432 F.3d at 479.

Kinbook has not presented any evidence from which a reasonable fact finder could conclude that Microsoft (1) was aware of Kinbook or its marks before naming its KIN and Kinect products, (2) intended to push Kinbook out of the market, or (3) named these products in an attempt to prey on Kinbook's reputation.  The only evidence Kinbook presented in support of this Lapp factor is that Microsoft conducted only one trademark search in October 2009 before filing its trademark application with the United States Patent and Trademark Office in April 2010.  Kinbook notes that it filed its trademark application in December 2009, two months after Microsoft conducted its trademark search.  Although it would have been prudent for Microsoft to have conducted a trademark search closer to the date of filing its application, if anything, this indicates that Microsoft did not act with the intent to prey on Kinbook, and likely was unaware of Kinbook's very existence.  Further, Microsoft notes that it filed its first trademark registration for Kinect in South Africa in October 2009, over one month before Kinbook began using the marks in December 2009.  MS Reply at 16.  This does not evidence a predatory intent on the part of Microsoft.

Kinbook argues that the Third Circuit Court of Appeals has adopted a "carelessness" standard for reverse confusion cases, and that all that is needed for this Lapp factor to weigh in its favor is for Microsoft to have acted with carelessness in deciding to use the purportedly infringing mark.  However, the Third Circuit Court of Appeals has not adopted a "carelessness" standard for such cases.  To the contrary, the Court of Appeals considered and declined to adopt such a test in Freedom Card, 432 F.3d at 480.  See also A & H Sportswear, 237 F.3d at 232-33 ("Although we recognize that our opinion in Fisons perhaps implied that mere carelessness, as opposed to deliberate intent to confuse, would weigh in a plaintiff's favor in a reverse confusion

case, we are reluctant to adopt such an interpretation, as it would be manifestly out of step with our prior holdings regarding the relevance of 'intent' in trademark infringement claims."); <u>MNI Mgmt., Inc. v. Wine King, LLC</u>, 542 F. Supp. 2d 389, 417 (D.N.J. 2008) (finding that "although there is evidence that defendants did not adequately search for use of the name "WINE KING," it is not enough to show that defendants had the requisite intent to push plaintiff out of its market.").

Kinbook has failed to present any evidence of predatory intent on the part of Microsoft. Accordingly, the Court concludes as a matter of law that no reasonable juror could find that this <u>Lapp</u> factor weighs in favor of finding a likelihood of confusion.

### F. Similarity of Channels of Marketing and Advertising (<u>Lapp</u> Factor No. 7)

The Third Circuit Court of Appeals has recognized that "the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." <u>Checkpoint</u>, 269 F.3d at 288-89 (quoting <u>Acxiom Corp. v. Axiom, Inc.</u>, 27 F. Supp. 2d 478, 502 (D. Del. 1998)). Applying this factor, courts are to consider the specific mediums by which the parties market their products "as well as the manner in which the parties use their sales forces to sell their products to consumers." <u>Checkpoint</u>, 269 F.3d at 289.

The evidence is undisputed that Kinbook's advertising is limited to "banner advertisements" on Facebook. In addition, Kinbox is available on and compatible only with Facebook. Kinect, on the other hand, is used exclusively with Microsoft's XBOX 360 console and is marketed and sold in electronics retail stores and on the Microsoft web site. Microsoft advertises its XBOX 360 products through a variety of media such as television and the internet.

The KIN phone could only be used with Verizon phones and was marketed and sold exclusively through Verizon Wireless online and retail stores.  In other words, the evidence makes clear that the products are marketed and sold through completely different, non-intersecting channels of trade.

Kinbook asserts that both parties market their products on Facebook.  Indeed, Facebook is the only medium through which Kinbook has advertised its Kinbox application.  However, as Microsoft points out, advertising on the internet and, more specifically, on Facebook has become vast and indiscriminate, and "virtually every business today" uses the internet and Facebook for marketing purposes.  See, e.g., Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1151 (9th Cir. 2002) ("*Some* use of the Internet for marketing, however, does not alone and as a matter of law constitute overlapping marketing channels." (emphasis in original)).  As the Sixth Circuit Court of Appeals observed in Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 637 (6th Cir. 2002), "a non-specific reference to Intenet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory."  In today's commercial world, a company's presence on Facebook is no different.[14]

Kinbook has failed to present any evidence from which a reasonable jury could conclude that the parties' marketing and advertising channels overlap in any way beyond their mutual use of Facebook.  Accordingly, the Court finds that this Lapp factor merits no measurable weight in the calculation of the likelihood of confusion.

---

[14]"The argument that the goods are 'related' in a trademark infringement sense because they are both marketed over the Internet (or if both types of goods are found on the eBay Web site) suffers from the same fallacy as the old "under the same roof" argument. . . . [I]n the Twenty-First Century, the Internet has become the venue for the advertising and sale of all manner of goods and services.  That the goods or services of the parties are both found on the Internet proves little, if anything, about the likelihood that consumers will confuse similar marks used on such goods or services."  McCarthy § 24:53.50 (4th ed. Supp. 2011) (citations omitted).

G.      **Similarity of Targets of Parties' Sales Efforts (**<u>**Lapp**</u>** Factor No. 8)**

When parties target their sales efforts at the same consumers, there is a greater likelihood of confusion.  <u>Checkpoint</u>, 269 F.3d at 289.  Here, the parties do not target their sales efforts at the same customers, nor do the parties' products and services compete.  The Kinect gaming sensor is targeted at customers who already have or are interested in buying an XBOX 360.  The KIN phone targeted customers interested in buying a new phone.  Kinbook, on the other hand, targets customers who use Facebook and want to share information with an enclosed group of family members.

Kinbook takes an expansive view of this <u>Lapp</u> factor and argues that Microsoft is undergoing a massive re-launch of its XBOX 360 platform with the release of Kinect and is now also targeting Kinbook's primary demographics: (1) Facebook users, (2) women, and (3) families.  Kin Response at 49.  However, if that were enough to satisfy this <u>Lapp</u> factor, the target audiences of Kinect and Kinbox would overlap with practically every product and service in every industry on the market today.  Evidence that Microsoft is "targeting" what amounts to virtually every consumer in the world does not constitute meaningful evidence that it is targeting the same consumers as Kinbook.

Accordingly, the Court concludes that Kinbook has failed to present any record evidence from which a reasonable jury could conclude that this <u>Lapp</u> factor weighs in favor of a finding of likelihood of confusion.

**H.      Similarity of Function Between the Products (<u>Lapp</u> Factor No. 9)**

As has been detailed at length, the Kinect gaming sensor, KIN phone, and Kinbox Facebook application all perform entirely different functions.  The Kinect is a hardware gaming sensor used primarily in playing video games.  The KIN was a telephone used primarily for making telephone calls.  Kinbox and Munchkinbox on the other hand are online social-media networking applications for Facebook.

Kinbook goes to great lengths to try to equate the functions of the Kinect with those of the XBOX 360 platform.  The "XBOX 360 Platform," as Kinbook defines it, includes the Kinect sensor, the XBOX 360 console, and an internet connection, whereby the user can access XBOX Live, and Facebook.  All of the articles, reports, and testimony Kinbook relies on for its argument relate to the functions of the "XBOX 360 Platform," not Kinect specifically.

Indeed, collectively, the "XBOX 360 Platform" has some functional overlap with the Kinbox application.  For example, as a secondary feature, the Kinect gaming sensor enables users to take pictures or videos of themselves while playing a game.  With the aid of the XBOX 360 console and an internet connection, users can then upload this user-created content onto the internet where they can share that content on social networking sites such as Facebook.  <u>See</u> Kinbook Ex. H, Friedman Dep. 21:4-22:6.  Similarly, when attached to the XBOX 360 and XBOX Live via an internet connection, the camera inside the Kinect sensor enables users to video chat with other users of the XBOX 360, XBOX Live and Kinect.  <u>See</u> <u>id</u>. at 38:17-39:11.

Although Kinbook tries to equate the functions of Kinect and Kinbox with elaborate diagrams, <u>see</u> Kinbook Ex. K, it ignores that Kinect, and the "XBOX 360 Platform" are not the same product.  The Kinect gaming sensor is merely one small part of the "XBOX 360 Platform,"

and the primary function of Kinect is to complement the XBOX 360 console with controller-less gaming.  While Microsoft has expressed the sentiment that Kinect has transformed the XBOX 360 into a "family entertainment center" that permits users to socialize, watch television and movies, and play games, Kinbox, by virtue of its trademark registration, does not have a monopoly on all uses of the term "kin" related to products that appeal to the family.  Simply because the larger "XBOX 360 Platform" overlaps in function with Kinbox to some degree, does not mean that there exists any likelihood of confusing Kinect with Kinbox.[15]

Accordingly, the Court concludes that Kinbook has failed to present evidence from which a reasonable jury could conclude that this Lapp factor weighs in favor of a finding of likelihood of confusion.

## I.      Likelihood of Expansion into Other Party's Market (Lapp Factor No. 10)

The record evidence is undisputed that Kinbook has no intention to expand its Munchkinbox or Kinbox marks into the mobile phone or video gaming arena.  Although Kinbook asserts that in "future phases the product would be accessible through a mobile phone device," it has not presented any evidence that it intends to expand its operations into the manufacture and sale of mobile phones.  See Kinbook Facts ¶¶ 3-4, 10.  The market for mobile phones and for mobile phone software applications are entirely distinct.  Regardless, Microsoft

---

[15] As noted in footnote 12 supra, at oral argument, counsel for Kinbook represented that Microsoft's motion for summary judgment is premature because Kinbook has not yet completed discovery.  Specifically, counsel noted that Kinbook has not yet deposed Microsoft CEO Steve Ballmer on statements he made in a January 20, 2011 interview with USA Today.  The Court is not convinced that this additional discovery would have any effect on the resolution of this motion.  Mr. Ballmer's statements in the USA Today interview related to the XBOX 360 platform as a multi-functional "family entertainment center" and are largely immaterial.  Microsoft never suggested that the only function of XBOX 360 is gaming, and no reasonable jury could conclude that an overlap in some functions between the XBOX 360 platform and Kinbox is likely to cause confusion between Kinect and Kinbox.

has discontinued production and sale of mobile phones carrying the KIN mark and has represented to the Court that it has no intention of reviving the KIN mobile phone product. Likewise, Kinbook has not presented any evidence to show that Microsoft has any intention of expanding the use of the KIN mark outside of the mobile phone area, or the Kinect mark outside of the gaming sensor area.  MS Facts ¶ 13.

Accordingly, the Court concludes that Kinbook has failed to present evidence from which a reasonable jury could conclude that this <u>Lapp</u> factor weighs in favor of a finding of likelihood of confusion.

## V.      CONCLUSION

For the foregoing reasons, the Court concludes that Kinbook has failed to raise any issue of material fact that could permit a reasonable jury to find in its favor.  Accordingly, the Court will grant Microsoft's motion for summary judgment.

An appropriate Order consistent with this Memorandum follows.


BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
UNITED STATES DISTRICT COURT